756 F.2d 1430
 55 A.F.T.R.2d 85-1285, 85-1 USTC P 9300
 Richard H. FOSTER and Sara B. Foster, T. Jack Foster, Jr.
and Patricia Foster, Jack R. Foster and Caroline Foster, and
Estate of T. Jack Foster, Deceased, Gladys H. Foster,
Executrix, and Gladys H. Foster, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 83-7745.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 16, 1984.
Decided April 3, 1985.
 
 Valentine Brookes, Brookes & Brookes, San Francisco, Cal., for petitioners-appellants.
 R. Pomerance, Washington, D.C., for respondent-appellee.
 Appeal from the Decision of the United States Tax Court.
 Before DUNIWAY, KENNEDY, and ANDERSON, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 In 1955, Jack Foster and his three sons formed a partnership, T. Jack Foster and Sons (Partnership), for the general purpose of dealing in property, with Jack as the managing partner. In 1958, the Partnership began to investigate the reclamation potential of Brewer's Island, a 2,600 acre undeveloped and partially submerged tract of land located about 12 miles south of San Francisco. After commissioning engineering studies, the Partnership determined that the tract could be transformed into a self-contained city (Foster City) of 35,000.
 
 
 2
 In December, 1959, the Partnership acquired an option to purchase the property for $12.8 million; in May, 1960, it secured enabling legislation from the California legislature for a municipal improvement district known as Estero, which was coterminus with Brewer's Island; and, in August, 1960, it exercised its option to purchase the tract. Thereafter, the Partnership and Estero began developing the property by neighborhood.
 
 
 3
 The Commissioner of Internal Revenue issued notices of deficiency to the Fosters for the years 1963-67 concerning their role in the development of Foster City. The Fosters appeal the United States Tax Court's affirmance of the Commissioner's determination. We affirm in part and vacate in part.
 
 I. Section 482
 
 4
 The Internal Revenue Code of 1954, Sec. 482, 26 U.S.C. Sec. 482 (1976), authorizes the Commissioner to reallocate income or deductions among commonly controlled businesses "if he determines that such ... allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such ... businesses."
 
 A. Standard of Review
 
 5
 In Sec. 482 cases, this court has held that "[t]he Commissioner has broad discretion under section 482, and neither we nor the Tax Court will countermand his decision unless the taxpayer shows it to be unreasonable, arbitrary or capricious." Erickson v. Commissioner, 598 F.2d 525, 528 (9th Cir.1979).
 
 
 6
 The Fosters argue that this standard was diluted in Commissioner v. First Security Bank of Utah, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), in which the Court concluded that "[t]he Commissioner's exercise of his Sec. 482 authority was therefore unwarranted in this case." 405 U.S. at 407, 92 S.Ct. at 1093. We do not believe the Court, by employing the term "unwarranted," was signaling a change in the standard of review. The issue before the Court was not the appropriate standard of review. Moreover, the Court was affirming the determination of the Tenth Circuit, which had employed the arbitrary and capricious standard in reaching its decision. See First Security Bank of Utah, N.A. v. Commissioner, 436 F.2d 1192, 1198 (10th Cir.1971).
 
 B. The "Avoidance" of Taxes
 
 7
 Section 482 refers to the "evasion of taxes," whereas the Tax Court based its decision on the Fosters' "avoidance of taxes." We have noted the "sometimes elusive" distinction between the two terms, Stewart v. Commissioner, 714 F.2d 977, 987 (9th Cir.1983), and agree with the Tax Court's finding that "for purposes of section 482, a non-punitive section, the terms are interchangeable." Foster v. Commissioner, 80 T.C. 34, 158 (1983).
 
 
 8
 The regulations support the Tax Court's holding.[1] Additionally, this court, in discussing the application of Sec. 482, has stated that "Congress enacted the predecessor of section 482 to prevent the evasion of taxes through such means as 'shifting of profits, the making of fictitious sales and other methods frequently adopted for the purpose of "milking." ' " Stewart, 714 F.2d at 987 (citations omitted). Put another way, the taxpayer must establish that he did not "cash in" on the gain. Id. at 989. In a civil case, a thorough analysis of the facts in light of the above criteria is more important than whether the Tax Court labeled its ultimate conclusion tax avoidance or evasion.
 
 
 9
 Our conclusion is not altered by Commissioner v. First Security Bank of Utah, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), in which the Court reiterated the long-standing shibboleth that a taxpayer is free to arrange his affairs in the manner calculated to minimize his tax liability. 405 U.S. at 398 n. 4, 92 S.Ct. at 1089 n. 4. In First Security, the Court disapproved the Commissioner's reallocation under Sec. 482. First Security, however, did not, as in this case, involve a nonrecognition transaction. Also, the determinative factor in disallowing the reallocation was that it would have been illegal for the entity to receive the income, id. at 401-402, 92 S.Ct. at 1090-1091, which is not the situation here.
 
 
 10
 C. Application of Sec. 482 to the Disposition of Property Acquired in a Nonrecognition Transaction
 
 
 11
 The first of the nine neighborhoods to be developed was Neighborhood One. In October, 1962, before any sales to builders were consummated, the Partnership transferred an undivided one-quarter interest in 127 acres of Neighborhood One to each of four newly formed corporations as tenants in common. Each of the four corporations, referred to collectively by the Tax Court as the Alphabets, was solely owned by one of the Fosters.
 
 
 12
 In August, 1966, the Partnership transferred 311 lots in Neighborhood Four, which had been improved to a lesser extent than Neighborhood One, to Foster Enterprises, a corporation owned by the Fosters in equal shares. Foster Enterprises, which was incorporated in 1960 to take title to a hotel in Hawaii, had accumulated a net operating loss of $1.2 million.
 
 
 13
 The Neighborhood One transaction was an exchange of property for stock under Sec. 351. The Neighborhood Four transaction was a contribution to capital under Sec. 1032. Under both sections, neither the transferor nor the transferee recognize gain or loss on the transfer, and the basis of the property does not change. The transferee therefore inherits the potential gain or loss inherent in the property at the time of its transfer.
 
 
 14
 The Tax Court was correct in its determination that the Commissioner may employ Sec. 482 to reallocate income derived from the disposition of property previously acquired in a nonrecognition transaction. Rooney v. United States, 305 F.2d 681, 686 (9th Cir.1962) (Section 482 will control when it conflicts with Sec. 351 as long as the discretion of the Commissioner in reallocating is not abused.); Treas.Reg. Sec. 1.482-1(d)(5) (1984); see also Stewart v. Commissioner, 714 F.2d 977, 989 (9th Cir.1983).
 
 D. Section 482 Reallocation
 
 15
 The Tax Court, pursuant to Sec. 482, reallocated all the income from the sale of the lots in Neighborhood One and Neighborhood Four from the Alphabets and Foster Enterprises to the Partnership. The income reallocated was divided into two parts, income due to appreciation in value before the transfers and income due to appreciation after the transfers.
 
 1. Pre-transfer Appreciation
 
 16
 The Tax Court reallocated the income attributable to appreciation before the transfers on the ground that the purpose of the transfers was to avoid taxes. It found that A.O. Champlin, the Fosters' long-time tax advisor, decided it was advantageous from a tax standpoint for the Fosters to undertake the development of Foster City in a partnership form. Losses incurred during the early years could then be used by the partners to reduce income on their personal tax returns. Later, as the land was developed, certain lots were transferred from the Partnership to its controlled entities in an effort to shift income. As noted by the Tax Court, "only highly appreciated inventory pregnant with income was conveyed." Foster, 80 T.C. at 179. Moreover, according to the testimony of Champlin, the value of money on hand to the Fosters far exceeded any interest that might eventually have to be paid on a tax deficiency, particularly when the rate of interest charged by the Government was less than that charged by commercial banks.
 
 
 17
 In the case of the Alphabets, which were formed within a month of the transfer, the Tax Court determined that the object was to shift from the Partnership the income from the sale of the lots and split it among taxpayers subject to a lower rate of tax. The Fosters argue that the transfer could not have been tax motivated because it would have increased taxes; the income reported by the Alphabets was not offset by any losses, whereas if the income had been reported by the Partnership, it would have been offset by the operating losses which the Partnership claimed on its returns. The Tax Court, however, found that "the tax savings to an individual realized by preserving a partnership loss may very well exceed the tax cost to his corporation incurred by reporting the income." Id., 80 T.C. at 173.
 
 
 18
 The Fosters contend that although the Neighborhood Four transfer may have resulted in a tax saving, it was made for a business purpose. There was evidence that Rex Johnson, a senior vice president of Republic National Bank who was in charge of monitoring the Fosters' account, insisted that the lots be conveyed to Foster Enterprises as a condition to Republic's renewing the Partnership's loans. The Tax Court discounted this as the motivation behind the transfer, and we find its reasoning persuasive.
 
 
 19
 Foster Enterprises was not indebted to Republic. It had borrowed money from Likins-Foster Honolulu Corporation and Roy Turner Associates, Ltd., a subsidiary of Likins-Foster. Both Likins-Foster and the Partnership were indebted to Republic.
 
 
 20
 According to Johnson, the transfer was necessary to improve the liquidity of Foster Enterprises and thereby (1) enhance the collectibility of the indebtedness of Likins-Foster to Republic, (2) improve the bank's security in the Likins-Foster stock, and (3) insulate the bank from the fortunes of the Foster partnership. The Tax Court, however, found that a special audit report prepared by the bank stated that the Likins-Foster loans were being paid according to schedule. Moreover, if Johnson were concerned about the ability of Likins-Foster to repay its loan, it would have made more sense to transfer the lots directly to that corporation because it was the Likins-Foster stock that had been pledged as security. The transfer of the lots obviously weakened the Partnership's ability to repay its loan to Republic, noted the Tax Court, and certainly exacerbated its cash flow problem.
 
 
 21
 The sales proceeds were not used by Foster Enterprises to liquidate its debts to Likins-Foster and Turner Associates. Rather, they were loaned to the Partnership to further develop Foster City. Although Foster Enterprises still had an asset, it was now, continued the Tax Court, an unsecured receivable from the Partnership. Collectibility was therefore dependent upon the Partnership's overall success with the Foster City undertaking, precisely the risk against which Johnson ostensibly wanted to protect.
 
 
 22
 The Tax Court found that the purpose of the Neighborhood Four transaction was to shift to Foster Enterprises the income earned from the sale of the lots so that it could be absorbed by that corporation's losses. The record contains ample evidence to support the Tax Court's conclusions concerning both the Neighborhood Four and the Neighborhood One transactions.[2] We therefore find that the Commissioner did not abuse his discretion in reallocating to the Partnership that portion of the sales income due to appreciation before the date of transfer. See Rooney v. United States, 305 F.2d 681, 684-85 (9th Cir.1962).
 
 2. Post-transfer Appreciation
 
 23
 Because Neighborhoods One and Four were both further developed after the transfers, a part of the income derived from the sale of lots was created after the transfer date. The Tax Court concluded that Estero was controlled by the Partnership, and was used by it as its instrument for the development of Foster City. Thus Estero's efforts were to be viewed as those of the Partnership, and the gain was to be attributed to it.
 
 
 24
 Estero, a Municipal Improvement District, was created in 1960 by a special act of the California legislature. It was authorized to tax and to issue tax-exempt bonds to finance its activities in reclaiming and improving Brewer's Island. It was also vested with a broad array of general governmental powers. As enumerated by the Tax Court:
 
 
 25
 It was empowered to reclaim land, make provision for street lighting, sewage, storm drainage, garbage and water service, and parks and playgrounds. It was also empowered to construct small craft harbors, provide fire and police protection, condemn land, enter into contracts, and make and enforce such regulations as were necessary and proper to the exercise of its enumerated powers. A violation of such regulation constituted a misdemeanor.
 
 
 26
 Foster, 80 T.C. at 58.
 
 
 27
 We agree with the Tax Court that during the years in issue, the Fosters, as the principal landowners and developers, controlled Estero. Indeed, the California Supreme Court has recognized that the Estero Act was designed by the California legislature to place control of the district in the landowner/developer. Cooper v. Leslie Salt Co., 70 Cal.2d 627, 451 P.2d 406, 408-409, 75 Cal.Rptr. 766, 768-769, cert. denied, 396 U.S. 821, 90 S.Ct. 62, 24 L.Ed.2d 64 (1969). The Tax Court stated:
 
 
 28
 There is no question that Estero added value to Brewer's Island. However, it never realized that value because it did not own the land or receive the proceeds from its sale. All we are deciding here is whether the value added by Estero is allocable to the Foster partnership because of the legislatively conferred control that the partnership exercised over the district. To answer that question in the affirmative does not require that we ignore Estero's legal identity as a public agency.
 
 
 29
 Foster, 80 T.C. at 169. Estero was the Partnership's creature, used by it to improve the land and thus increase its value. That is what it was designed to be and do. Because it is a public body, validly created, its own income, if any, belongs to it, and would not be allocable to some other entity.
 
 
 30
 Commissioner v. Birch Ranch & Oil Co., 192 F.2d 924 (9th Cir.1951), on which the Partnership relies, is quite different from our case. There, the taxpayer owned substantially all the land in a California reclamation district, and, along with certain related parties, substantially all of the district's bonds. In order to pay interest on the bonds, the district made assessment calls which the taxpayer paid and later deducted as taxes. The Commissioner denied the deduction on the ground that the payor and the payee were economically identical. We upheld the deduction, stating:
 
 
 31
 Since the district met the requirements of California law, its status as a district entity, not to be confused with the owners of the ranch, or the taxpayer-corporation, cannot be questioned regardless of the fact that the district served but a single ranch, (plus one 240 acre parcel). The western states have long considered that the reclamation, even of a single parcel of land in single ownership, may justify the exercise of sovereign powers.
 
 
 32
 192 F.2d at 928. The case dealt with the validity, as a tax deduction by the owner of the property in the district, of an assessment levied by the district against the landowners and actually paid by the owners to the district. Nothing comparable is involved in our case.
 
 
 33
 The Tax Court stated that its finding that the Partnership controlled Estero did not conflict with the district's status as a "juristic entity," and therefore, Birch Ranch & Oil was inapposite. 80 T.C. at 169. We agree. The primary question here is not whether Estero is an independent entity. The primary question is whether the Commissioner can allocate to the Partnership the income arising from value created by Estero that would have gone to the Partnership but for the transfers to the Alphabets and Foster Enterprises. The Alphabets' and Foster Enterprises' function was to divert what would normally be the income of the Partnership away from it and to the Alphabets and Foster Enterprises. If the transfers had not been made, the income in question would not have been Estero's; it would have been that of the Partnership. The relationship between the Partnership and its creatures, the Alphabets and Foster Enterprises, was precisely the same, whether the appreciation in value occurred before the transfers or after them. Under section 482, the Commissioner may allocate income earned subsequent to the income evading event or transfer. The fact that some of it is attributable to a time following the transfers makes no difference. Because Estero did not own the land, the gain in value would never accrue to Estero, but would have accrued to the Partnership, the landowner, but for the transfers. By the transfers, the Partnership shifted that income away from itself and to the Alphabets, which had nothing, and to Foster Enterprises, which had large losses from unrelated ventures. By that device, the Partnership sought to get out from under large tax liabilities and yet retain control of Foster City. Under Sec. 482, the Commisioner could reallocate to the Partnership the income that the Partnership had shifted to the Alphabets and Foster Enterprises. The transfers had no business function; their purpose was tax avoidance. The Tax Court properly upheld the Commissioner's reallocation.
 
 II. The Westway Notes
 A. Form Over Substance Doctrine
 
 34
 As of August, 1962, the Partnership had borrowed $3 million from Republic for the development of Foster City. As an inducement for the loan, the Fosters agreed that, in addition to interest, they would pay a bonus equal to the amount borrowed. Republic desired that the bonus be structured as capital gain rather than ordinary income. The advantage to the Partnership would be a stepped-up basis in the land.
 
 
 35
 Thus began a complex succession of incorporations, transfers, liquidations, and mergers. See Foster, 80 T.C. at 198-200. At the core of this arrangement was the conveyance and reconveyance of stock in Foster Bayou, a corporation organized by the Fosters and capitalized with 200 acres of land in Foster City. In August, 1962, the Partnership sold its stock in Foster Bayou to Westway Investment Co. for $5,000 cash and a $100,000 non-interest-bearing note. Westway was a subsidiary of Howard Corporation, which in turn was owned by trustees for the benefit of Republic's shareholders. In May, 1964, Esteroy, a corporation organized by the Fosters the previous year and capitalized with $10,000, bought the stock from Westway for $5,000 cash plus $3.1 million in non-interest-bearing notes (Westway Notes). Both Foster Bayou and Esteroy were later liquidated so that the Partnership eventually assumed the notes.
 
 
 36
 The Tax Court, relying on the well-established doctrine of form over substance, see Stewart, 714 F.2d at 987-88, found that the notes represented an obligation by the Partnership to pay interest on the money borrowed from Republic, rather than the cost of reacquiring the Foster Bayou stock. Consequently, the Tax Court disallowed the Fosters the $3 million step-up in the basis of two of the Foster City neighborhoods. On review, the Tax Court's determination that the Westway transaction was lacking in economic substance will not be set aside unless clearly erroneous. Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).
 
 
 37
 Contrary to the Fosters' assertion that the notes were indicative of the profit-sharing aspect of a partnership, the Tax Court cites overwhelming evidence that the relationship between the Fosters and Republic was always one of debtor-creditor. Foster, 80 T.C. at 202-203. Additionally, Republic's right to share in the profits was strictly limited in amount, the bank bore no risk of loss except with respect to its loan, and it was not entitled to participate in the management of the project.
 
 
 38
 The Fosters contend that $3.1 million ($15,500/acre) was a realistic price, not because of evidence that that was the value of the land, but because of the property's alleged investment potential. Their argument that the transaction was made at arm's length, however, is belied by the fact that although the Fosters had originally paid approximately $4500 per acre for the land, Foster Bayou, in selling the stock to Westway for $105,000, sold it for about $500 per acre. The Tax Court noted that Westway was not equipped to develop the land, nor did it improve the land during its ownership. Moreover, the record contained evidence (correspondence between Jack Foster and his attorney) that that particular parcel was chosen only because it could be expediently transferred. Id. at 94-95.
 
 
 39
 In any event, the result of this complex series of transactions was that when Esteroy purchased the Foster Bayou stock from Westway, it recovered the $5,000 in cash that it originally paid to purchase the stock; its $100,000 non-interest-bearing note was effectively canceled by Esteroy's $100,000 non-interest-bearing note, both of which were due on the same date; Westway's gain on the transaction was therefore $3 million, the amount of the bonus that the Fosters had agreed to pay under their agreement with Republic. Furthermore, the $3 million was structured as capital gain (gain derived from the sale of corporate stock), which was also part of the agreement. Finally, that the Partnership anticipated the "sale" and "repurchase" of the stock by the Fosters for the purpose of disguising the agreed upon bonus as capital gain was evidenced by correspondence between Jack Foster and his attorney. Foster, 80 T.C. at 94.
 
 
 40
 United States v. Mississippi Chemical Corporation, 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972), is distinguishable. In that case, cooperative associations under the Agricultural Marketing Act were required to purchase stock in a member bank as a condition for securing a loan. The Court held that the stock was a capital asset having long-term value. Its cost, therefore, was not deductible as an interest expense. Here, although the Fosters were required to pay a sum in addition to the stated interest rate, they received nothing in return other than the amount borrowed. An additional reason noted by the Court in Mississippi Chemical for disallowing the interest deduction was that Congress had intended to provide loans to farmers at low interest rates; it therefore would have been "odd" for Congress to have provided a hidden interest charge in the legislation. 405 U.S. at 310, 92 S.Ct. at 915. No such considerations of legislative intent apply in this case.
 
 
 41
 We find that the Westway Notes represented "the amount [the debtor] contracted to pay for the use of borrowed money." Old Colony Railroad Company v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932). Thus, the Commissioner was not clearly erroneous in characterizing them as interest.
 
 B. Capitalization of Interest
 
 42
 The Fosters contend that if the Westway Notes represent an obligation to pay additional interest, then under 26 U.S.C. Sec. 266 (1976), such interest may be capitalized at the election of the Partnership and added to the basis of the land. Section 266 provides:
 
 
 43
 No deduction shall be allowed for amounts paid or accrued for such taxes and carrying charges as, under the regulations prescribed by the Secretary, are chargeable to capital account with respect to property, if the taxpayer elects, in accordance with such regulations, to treat such taxes or charges as so chargeable.
 
 
 44
 The Tax Court, relying on the language of Sec. 266, legislative history, and the regulations, found that an item not otherwise deductible may not be capitalized under Sec. 266. Foster, 80 T.C. 212-213. The Partnership used the cash, rather than the accrual, method of accounting. Under the cash method, interest may not be deducted until it is paid. 26 U.S.C. Sec. 461 (1976); Treas.Regs. Secs. 1.461-1(a)(1), 1.446-1(c)(1)(i) (1984).
 
 
 45
 We agree with the Tax Court's analysis and therefore find that the Partnership may not capitalize interest that it did not pay. The Fosters do not dispute that the Partnership paid no portion of the Westway Notes during the years in issue. Thus, the option of capitalizing the Westway Notes was not available.
 
 
 46
 Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), does not change this result. Under Crane, a taxpayer may include the amount of a loan in computing the basis in the property against which the loan was taken. The loan, however, is a part of the cost of the property, whereas interest is the cost of the loan. Congress has expressly provided for interest in the form of a deduction. 26 U.S.C. Sec. 163(a) (1976).
 
 C. Charitable Deductions
 
 47
 The Partnership conveyed three parcels of land in Foster City for which it claimed charitable deductions: a school site, by gift deed, and two church sites for $20,000 per acre. On its tax returns, the Partnership valued the sites at $40,000 per acre, deducting the difference as a charitable contribution.
 
 
 48
 A business will not be allowed a charitable deduction if the dominant motive behind the transfer was the expectation of economic benefit. Allan v. United States, 541 F.2d 786, 788 (9th Cir.1976). Contrary to the Fosters' assertion, this standard was employed by the Tax Court. Foster, 80 T.C. at 223. The Tax Court's determination that the Fosters were not entitled to a charitable deduction will not be overturned unless it was clearly erroneous. Allan, 541 F.2d at 788.
 
 
 49
 The Tax Court found that, as demonstrated by Estero's prospectus and the Partnership's promotional publications, Foster City was designed to be a self-sufficient community with provision for all services required by the resident population, including schools and churches. The Tax Court determined that the transfer of the three sites was therefore designed to enhance the value of the Partnership's remaining land and to promote its sale. See Stubbs v. United States, 428 F.2d 885, 886-87 (9th Cir.1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971). Additionally, concluded the Tax Court, the transfer of the school site was made to secure the cooperation of the school district and to persuade the district to abandon its threat to cancel school bus service to Foster City.
 
 
 50
 The Fosters object to the Tax Court's attributing the representations in Estero's prospectuses to the Partnership. Given our holding that the activities of Estero may not be attributed to the Partnership, we agree with the Fosters' contention. The Fosters, however, do not challenge the Tax Court's finding that the same benefits were touted in the Partnership's publications. Thus, even without attributing the Estero prospectuses to the Partnership, the Tax Court's finding, that there was sufficient motivation of economic benefit to disallow the deductions, was not clearly erroneous.
 
 
 51
 The Fosters argue that if the transfers are disallowed, the cost of the school site should be capitalized as part of the Partnership's basis in only the residential acreage of the neighborhood the future school would serve (Neighborhood One), rather than the Commissioner's capitalization of the cost as part of the Partnership's basis in all of lits remaining land in Foster City. The Fosters state that the only benefit to flow from the transfer was the continued bus service, which was of benefit only to Neighborhood One. We, however, do not believe that the Tax Court was clearly erroneous in finding that, "[t]he transfer was the first step in implementing the partnership's neighborhood school plan. Moreover, it gave credibility to its 'sales pitch' that Foster City was a planned community. Both of the factors enhanced the value and promoted the sale of land in all the neighborhoods and not just in Neighborhood One." Foster, 80 T.C. at 226.
 
 D. Business Deductions
 
 52
 The Tax Court affirmed the Commissioner's determination that a portion of the Fosters' travel and entertainment expenses were personal to the Fosters and therefore not deductible as business expenses. The deficiency notice did not itemize the particular deductions disallowed, but instead gave the total disallowance for each taxpayer. We note initially that the deficiency notice was not defective. Abatti v. Commissioner, 644 F.2d 1385, 1389-90 (9th Cir.1981).
 
 
 53
 The Commissioner's deficiency determination carries a presumption of correctness. Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir.1975), cert. denied, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). The Fosters' reliance on Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir.1979), and United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), is misplaced. In Weimerskirch, this court interpreted Janis as indicating "that the Commissioner must offer some foundational support for the deficiency determination before the presumption of correctness attaches to it." 596 F.2d at 361. In both Weimerskirch and Janis, however, the Commissioner had determined that the taxpayer had unreported income. As a rationale for its decision, the Weimerskirch court observed that absent a showing by the Commissioner, the taxpayer, in a case of unreported income, would have the difficult task of proving a negative. Id. Such is not the case with a deduction.
 
 
 54
 "The presumption in favor of the Commissioner is a procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." Rockwell, 512 F.2d at 885. The evidence offered by the Fosters to rebut the presumption was testimony that their recordkeeping system was accurate and that the examining revenue agent so scrambled their records that they could not be reassembled to prove the legitimacy of the claimed deductions. The Fosters do not dispute the Commissioner's assertion that they agreed with several of the Commissioner's adjustments, thus undermining their argument that their record-keeping system was fail-safe. In any event, we agree with the Tax Court that the Fosters' self-certification of their record-keeping system is not a substitute for proof of their deductions. Deductions are a matter of legislative grace with the taxpayer bearing the burden of their substantiation. Rockwell, 512 F.2d at 886. We cannot say that the Tax Court's decision that the Fosters did not carry this burden was clearly erroneous. See Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir.1984).
 
 E. Penalty
 
 55
 The Tax Court affirmed the Commissioner's assessment of a penalty against Jack and Gladys Foster for negligent or intentional disregard of income tax rules and regulations. 26 U.S.C. Sec. 6653(a) (1976). We vacate the assessment. This is a case of first impression with no clear authority to guide the decision makers as to the major and complex issues. The positions taken by the Fosters were reasonably debatable. Under all of the circumstances, we do not believe it can be fairly said that the Fosters acted negligently or intentionally in disregard of the law.
 
 
 56
 AFFIRMED in part, VACATED in part.
 
 
 
 [1]
 "Transactions between one controlled taxpayer and another will be subject to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes.... In determining the true taxable income of a controlled taxpayer, the district director is not restricted ... to the case of a device designed to reduce or avoid tax by shifting or distorting income ...." Treas.Reg. Sec. 1.482-1(c) (1984) (emphasis added). "Section 482 may, when necessary to prevent the avoidance of taxes or to clearly reflect income, be applied...." Id. at Sec. 1.482-1(d)(5) (1984) (emphasis added)
 
 
 [2]
 The Fosters move to augment the record with an additional deposition of A.O. Champlin. The deposition is not properly before this court; the motion is therefore denied. Karmun v. Commissioner, 749 F.2d 567, 570 (9th Cir.1984)