In the Matter of Ezra Augustus
STROUPE, Jr., Debtor(s).

Bankruptcy No. 83–1955.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 24, 1986.

Richard F. Mitchell, Atty., Tax Div., Washington, D.C., and Lynne England, Asst. U.S. Atty., Tampa, Fla., for the United States.

Halton Hart, Tampa, Fla., for debtor.

Geoffrey O'Conner, tax counsel, for debtor.

## ORDER ON OBJECTION TO CLAIM OF IRS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case, and the matter under consideration is an objection to the claim filed in the above-captioned case by the United States Government (IRS). The claim is based on alleged unpaid income taxes in the amount of $35,772.00 for the tax year 1980, $43,552.00 for the tax year 1981, and $40,032.00 for the tax year 1982. The alleged unpaid income taxes are based on the return filed by the Debtor, Ezra Augustus Stroupe (Debtor), which was audited by the IRS who determined after audit that certain items were improperly deducted by the Debtor, which in turn resulted in a deficiency thereby creating the income tax liability of the Debtor now asserted by the IRS in the claim under challenge. The evidence presented at the final evidentiary hearing reveals the following facts relevant to a resolution of the issues raised by the parties:

Cambridge Research and Development (Cambridge) is a limited partnership formed sometime in the 1970's and was primarily engaged in the acquisition of patent rights and marketing the same either through licensing arrangements or later on through outright sale of the patent rights. Sometime in 1976 Cambridge acquired all rights to an invention known as a "waterdrill" covered by Patent No. 3,865,194 from the inventor, Mr. Chatfield. The device is an encased turbine unit driven by kinetic energy generated by water pressure which, in turn, drives a drill capable of penetrating materials generally used in construction including cement blocks. The drill, when it is activated, dispenses water spray which is designed to control and fight fires and to assist the operator in gaining safe and speedy access to the source of the fire through penetration of barriers commonly encountered by firefighters such as outside and inside walls, doors and roofs.

Pursuant to the agreement to purchase, Cambridge agreed to pay to Mr. Chatfield fifty percent of any down payment received by Cambridge in connection with the sale of the waterdrill. The agreement further provided that in no event shall Chatfield's down payment be less than $250,000 plus a fifty/fifty division of royalties and the ultimate purchase price of the waterdrill was not to exceed $1,150,000. Based on sales of the product covered by the patent to date, Mr. Chatfield has been paid a total of $298,000.

Mr. Sherman, the general partner of Cambridge, met the Debtor in 1976 and discussed the device covered by the Chatfield patent. The Debtor, who expressed a great interest in the device, engaged in extensive discussion with Sherman concerning the possible acquisition of the patent rights. After several demonstrations by Sherman of the operation of the device, Sherman prepared a formal projection of the anticipated sales of the device. As noted earlier, Cambridge initially licensed the patents it acquired, but later on turned to selling the patents because it came to the conclusion that sales versus licensing was a sounder economic approach of marketing because it believed that there was a greater assurance of return under a sale than it would receive under a licensing agreement.

The negotiations between Sherman and the Debtor culminated in the execution of an agreement. Under this agreement Cambridge agreed to sell to a newly formed limited partnership, American Fire and Industrial Products Company (AFIPC), headed by the Debtor, all rights to the Chatfield patent. While the initial asking price sought by Cambridge was $10,000,000.00, the parties ultimately arrived at the price of $5,700,000.00. The agreement called for a cash down payment of $1,048,000.00 and the balance in the amount of $4,652,000.00 was to be paid to Cambridge but only out of the receipts of the successful undertaking. The note issued by AFIPC to Cambridge was a nonrecourse note; therefore, none of the partners of AFIPC were personally liable on the note. Upon default of the note Cambridge was entitled to foreclose its security interest on the patent, which, of course, at that time was the sole asset of AFIPC.

The purchase agreement with Cambridge provided that AFIPC must pay off the note for the balance of the purchase price, originally due on January 2, 1984. By instrument dated December 15, 1983, the maturity of the note was extended for four years, until January 2, 1988. AFIPC paid no consideration to Cambridge for the extension, even though the original purchase agreement called for a $50,000.00 payment for a one-year extension. (Tr. 53, Gov't Exs. 3 and 5). To date nothing has been paid by AFIPC on the principal of the nonrecourse note ($4,652,000), nor on the 11.5 percent annual interest accruing under the terms of the note since the execution of the note. (Tr. 57).

In 1978 AFIPC formed a wholly-owned subsidiary corporation, Amfire Industries, Inc. (Amfire), and licensed Amfire to market and promote the waterdrill in the United States. Under the License Agreement dated September 1, 1978, AFIPC agreed to make annual payments or reimbursement of Amfire's expenses, in the following amounts:

$225,000 for the year of 1979
225,000 for the year of 1980
$225,000 for the year of 1981
200,000 for the year of 1982
175,000 for the year of 1983
100,000 for the year of 1984

AFIPC was capitalized through sales of limited partnership interests through solicitation and was successful in raising $2,475,000.00 initially, and later on through a second offering, $1,000,000.00, which represents the entire capitalization of the AFIPC.

Pursuant to the licensing agreement, Amfire agreed to pay its parent AFIPC one third of its gross sales as royalties. The Agreement, however, did not require payment of anything unless gross sales on an annual basis should exceed $500,000.00 (Gov't Ex. 25). The gross sales of the device never exceeded such an amount, thus no royalties have ever been paid to AFIPC. It is without dispute that AFIPC never had income from the sales of the waterdrill. The entire history of this AFIPC undertaking has been unsuccessful. In almost ten years of marketing, only 400 to 500 units of the waterdrill have been sold.

According to expert testimony, the poor performance of the device is basically attributable to a radical change in the buying attitude of the relevant market, represented primarily by municipal and county firefighting units, whether professional or volunteer firefighters. In recent years all of these prospects have been faced with budgetary restraints, and therefore, accorded priority to the acquisition of primary firefighting equipment such as pumping units and front line items rather than for a device not considered to be an indispensable firefighting tool.

In addition to AFIPC the Debtor also formed a wholly owned corporation under the name of the Easton Corporation (Easton). Easton also owned all the outstanding shares in another corporation formed by the Debtor under the name of Amfire Industries, Inc. (Industries). It is without dispute that the Debtor was the principal in all these entities and he was also a limited partner in Cambridge, the previous owner

of the patent involved. Under the arrangement, Industries was to manufacture and market the product domestically and pay royalties to the AFIPC for the use of the patent. Industries was also required to pay a fee to the Debtor for his services. Under the agreement AFIPC was to be in charge of the engineering, that is, further development of the patent. AFIPC did, in fact, substantially modify the design of the device and obtained eight additional patents based on the original concept which now protects and covers the waterdrill involved in this controversy.

Sometime later the AFPIC negotiated and ultimately obtained a loan from Beneficial Finance in the amount of $572,000.00. This loan was also collateralized by all assets of AFPIC already pledged to Cambridge. However, in order to secure the loan from Beneficial, Cambridge consented to a subordination of its interests, and at this time Cambridge is in a second position concerning its security interests on the assets of AFPIC.

The Debtor filed his income tax returns for 1980, 1981, and 1982 (the tax years in question), and claimed deductions based on an accelerated depreciation of the waterdrill patent based on an alleged useful life of the device projected or estimated by the Debtor to be eight years. This estimation was not based on the usefulness as a mechanical device, but only on the economic life of the device because it was expected that after eight years the market will be saturated and there will not be anymore market for the product. There is evidence in the record to indicate that the device would be usable and still in operating condition even after eight years.

The AFIPC depreciated the waterdrill based on the purported purchase price of the patent of $5,700,000.00 and also claimed accrued interest deductions on the nonrecourse note and accrued reimbursement obligations to Amfire, and accrued obligations to the Debtor. These deductions are as follows:

Depreciation (Amortization)

$716,171 for the year of 1980
$716,171 for the year of 1981
716,171 for the year of 1982
TOTAL $2,148,513

Interest
$534,984 for the year of 1980
687,410 for the year of 1981
775,793 for the year of 1982
TOTAL $1,998,187

Amfire obligations
$200,000 for the year of 1980
245,000 for the year of 1981
200,000 for the year of 1982
TOTAL $645,000

Guarantee to general partner
$ 91,500 for the year of 1980
97,500 for the year of 1981
103,500 for the year of 1982
TOTAL $292,500

The IRS audited the returns filed by the Debtor for each of the years in question and disallowed the deductions claimed by the Debtor and assessed a deficiency claim in the amounts of $35,772.00 for the tax year 1980, $43,552.00 for the tax year 1981, and $40,032.00 for the tax year 1982. The determination of deficiency by the IRS was based on the proposition advanced by the IRS that the alleged purchase price agreed upon between the partnership, AFIPC, and Cambridge was a highly inflated artificial number, totally unrealistic and did not represent the true economic value of the patent; that the sole purpose of the transaction was to evade taxes and create a tax shelter for the limited partners including the Debtor who invested in AFIPC.

In support of this proposition, the IRS contends that the patent was basically worthless and, in any event, not worth what was stated by the Debtor, and the most it could be valued at would be $1,400,000.00, which was the actual cash payment made for the purchase of the patent. In addition, it is the contention of the IRS that the unpaid portion of the purchase price represented by a promissory note payable to Cambridge which was extended twice was merely a paper transaction and a sham and not a realistic evaluation of the economic value of the device, therefore, could not be recognized to represent as part of a

bona fide purchase price for the patent in question.

This boils down to the question of whether or not the transaction was an arm's length transaction between Cambridge and AFIPC and bona fide purchase of a patent right with the expectation of engaging in business and creating a positive return to the investors in the limited partnership rather than just a device to enable an indirect tax benefit to the investors by taking advantage not only of the losses which according to the IRS was contemplated from the beginning to offset the limited partners' income derived from other sources but also the depreciation claimed based on the stated purchase price asserted to be a sham by the IRS.

■ Before considering the applicable provisions of the Internal Revenue Code, one last comment is in order. It was intimated by the IRS that in addition to disallowing the depreciation claimed by the Debtor of the waterdrill, certain expenses which were expended by AFIPC, should also be disallowed. There is no evidence in this record whatsoever as to what specific items were improperly claimed as legitimate expenses by AFIPC, or whether or not the losses suffered by AFIPC were, in fact, losses which could be properly taken advantage of under the tax laws; therefore, this aspect of the tax claim filed by the IRS is without basis and cannot be recognized.

■ Considering the deficiency determined by the IRS, it should be stated at the outset that the determination of the Internal Revenue Service, as reflected in its proof of claim, is presumed to be correct, and the burden is upon the Debtor to show, by a preponderance of the evidence, that the determination is erroneous. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed.2d 623 (1935). Income tax deductions depend upon legislative grace, and the clear obligation is upon the taxpayer to establish his entitlement thereto. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); *Foster v. Commissioner*, 756 F.2d 1430 (9th Cir.1985).

■ Applying the foregoing general principles to the specific facts of this case, this Court is satisfied that the IRS was incorrect in disallowing the Debtor's deductions of losses claimed on his tax returns filed for the years in question. AFIPC acquired the waterdrill patent from Cambridge after an extensive testing and investigation of the device by the Debtor. After the acquisition AFIPC embarked on an earnest marketing program albeit without success. The losses it sustained were not artificial paper losses, but real losses. There is nothing in this record which would justify the finding that AFIPC was not a legitimate business enterprise created for the purpose of carrying on a legitimate business. The fact that the investors considered a tax advantage when they purchased their limited partnership interest by taking a deduction of an accelerated depreciation based on the stated purchase price is of no consequence, neither is the fact that AFIPC was undercapitalized of any significance. If undercapitalization would be a valid basis to determine that an entity without adequate capitalization is a sham and would not be recognized as a legitimate enterprise, very few, if any, corporations in this state would survive a similar attack by the IRS. Therefore, the deductions claimed by the Debtor for the years in question were proper and should not have been disallowed by the IRS.

■ This is not the case, however, concerning the accrued but not paid interest obligation on the note executed as part of the purchase price of the waterdrill. This nonrecourse note, while it facially evidenced a legitimate obligation in the amount of $4,652,000.00 due to Cambridge, it did not really represent a fixed, enforceable obligation of AFIPC. First, there was no obligation to repay the note except only out of revenues derived from the successful marketing of the device. Second, even though the note was to mature on 1/2/86, Cambridge agreed to a four-year extension without receiving any consideration for the

extension even though the original purchase agreement called for a payment of $50,000.00 for a one-year extension, to date nothing has been paid either on the principal nor on the interest to Cambridge. Third, the Debtor, the general partner and principal of AFIPC, was also a limited partner in Cambridge. Moreover, the IRS is correct in part concerning the proper basis for the claimed depreciation.

This Court is satisfied that the stated purchase price for the acquisition of the patent did not represent the true economic value of the device and the true worth of the patent was no more than the cash consideration actually paid for the device. Considering the repayment terms of the nonrecourse note and the relationship of the parties, it is evident that the stated purchase price for the device was an artificially inflated price no doubt fixed for the purpose to enable the Debtor to offer an attractive limited partnership interest to investors in AFIPC by emphasizing the tax advantages through the accelerated depreciation of the device based on the stated purchase price.

Based on the foregoing, this Court is satisfied that the true value of the device was no more than the amount actually paid for the device; that is $1,048,000.00. The parties are directed to confer, and to agree if possible on computations consistent with this decision and on the form of an order. If agreement on computations is not possible, each party shall submit its computations, with an explanatory memorandum, separately to the Court.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection to Claim of IRS be, and the same is hereby, sustained. It is further

ORDERED, ADJUDGED AND DECREED that ruling on the issue of amount of depreciation to be allowed be, and the same is hereby, deferred pending submission of computations and memoranda by the parties.