EARL O. BERGERSEN and EVELYN K. BERGERSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bergersen v. Commissioner
Docket No. 11747-92.
United States Tax Court
T.C. Memo 1995-424; 1995 Tax Ct. Memo LEXIS 418; 70 T.C.M. (CCH) 568; August 29, 1995, Filed *418 Decision will be entered under Rule 155. James M. O'Brien, Thomas M. Haderlein, Michael J. Wilczynski, Mark A. Oates, and Tamara L. Frantzen, for petitioners. William T. Derick, for respondent. PARKER, Judge PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to the tax as follows: Additions to Tax
Sec. 6651
Sec. 6653
Year
Deficiency
(a)(1)
(a)(1) [1]
Sec. 6653(a)(2) [2]
Sec. 6661
1985
$ 460,309
$ 45,731
$ 23,015
50% of interest
$ 115,077
on $ 460,309
1986
402,781
60,417
20,139
50% of interest
100,695
on $ 402,781
1987
1,347,642
-  67,382
50% of interest
336,911
on $ 1,347,642
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issues remaining for decision are: *421 (1) Whether petitioners Earl O. Bergersen and Evelyn K. Bergersen *419 were bona fide residents of Puerto Rico during the entire taxable years 1986 and 1987 and, therefore, were entitled to exclude from gross income all income derived from sources within Puerto Rico under section 933(1); (2) whether the gain or a portion of the gain realized by petitioners on the sale of their home in Winnetka, Illinois, in November of 1985 is taxable, or whether petitioners may defer gain recognition under section 1034; (3) whether certain withdrawals made by Earl O. Bergersen from Ortho-Tain, Inc., constitute bona fide loans or constitute constructive dividends or, alternatively, compensation for services, or some combination thereof; (4) whether petitioners are entitled to deduct the payments made to Ortho-Tain, Inc., during each of the taxable years at issue as interest paid with respect to the purported loans; [2]
(5) whether petitioners are liable for additions to tax under section 6651(a)(1) for the late filing of their Federal income tax returns for 1985 and 1986; [3]
(6) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) or section 6653(a)(1)(A) and (B) for negligence or disregard of rules or regulations for the years at *420 issue; and (7) whether, except for certain items to which respondent concedes the addition does not apply, petitioners are otherwise liable for additions to tax under section 6661 for substantial understatement of income tax for the years at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed in this case, Earl O. Bergersen and Evelyn K. Bergersen (collectively referred to as petitioners) resided in Dorado Beach, Puerto Rico. Petitioners filed Federal income tax returns for the taxable years 1982 through 1986 at the Internal Revenue Service Center located in Kansas City, Missouri. Petitioners timely filed a *422 Federal income tax return for the 1987 taxable year at the Internal Revenue Service Center located in Philadelphia, Pennsylvania. Petitioners filed State of Illinois income tax returns for the taxable years 1982 through 1986. Petitioners did not file a Commonwealth of Puerto Rico income tax return for the 1986 taxable year. Petitioners filed such income tax returns in Puerto Rico for the 1987 and 1988 taxable years. [4]
*423 Background
Earl O. Bergersen (petitioner) was graduated from the Northwestern University Graduate School in Dentistry (the Northwestern Dental School), with degrees in dentistry (D.D.S.) and in orthodontics (M.S.D.). In 1959, petitioner established an orthodontics practice in Winnetka, Illinois, a northern suburb of Chicago. Petitioner subsequently moved his practice into a commercial office building in Winnetka that he and his wife, Evelyn K. Bergersen (Mrs. Bergersen), purchased. Petitioner and Mrs. Bergersen have three children: Leslie (born December 9, 1960), Lauren (born January 14, 1964), and Brian (born June 18, 1965). Petitioner and Mrs. Bergersen for much of their married life resided at 840 Lamson Drive in Winnetka, Illinois (the Winnetka house). In the early part of their marriage, Mrs. Bergersen was a homemaker rearing the children. In addition to his orthodontics practice, petitioner conducted research, published articles, and lectured extensively on orthodontics. Petitioner also taught for some 22 years as an adjunct professor at the Northwestern Dental School and appeared as a guest lecturer at other dental schools. Petitioner did not accept remuneration for *424 his teaching activities because he enjoyed teaching and viewed it as a contribution to his profession. In the 1960's and 1970's, petitioner conducted research for the purpose of identifying and creating new orthodontic products. Petitioner invented and patented the Positioner and the Occlus-o-Guide, which are designed to obviate the need for children to wear braces. In 1968, petitioner organized Ortho-Tain Enterprises, Inc. (OTE), through which he sought to market these products by essentially operating a family-run mail order business out of the family home. [5]
*425 OTE purchased its finished inventory from unrelated manufacturer/suppliers which produced the orthodontic appliances using molds provided by OTE. The family would sit around the kitchen table in the evenings and inspect the appliances for symmetry, coloration, and other quality traits. Petitioners stored the inventory in the basements of their Winnetka house and their Winnetka office building. During the early 1970's, OTE experienced a dramatic decline in the quality of the contract-manufactured appliances. OTE's rejection rate of the appliances increased from 10 percent to 50 percent. Moreover, OTE was experiencing difficulty in obtaining a sufficient supply of products on a timely basis to satisfy its customer demand. Petitioner decided that the only way to overcome these problems was to undertake manufacturing the products himself rather than subcontracting the work to unrelated manufacturers. On October 2, 1974, petitioner and Mrs. Bergersen incorporated Ortho-Tain, Inc. (Ortho-Tain or the corporation), under the laws of the State of Delaware to manufacture and sell petitioner's inventions. Petitioner served as the president of the corporation, and Mrs. Bergersen served as *426 the secretary of the corporation. Petitioners were at all relevant times the only members of Ortho-Tain's board of directors. Petitioner and Mrs. Bergersen did not receive any salary from Ortho-Tain during the calendar years 1978 through 1987. See supra note 5. Ortho-Tain's stock was owned by the following individuals during the years at issue: Number
Stockholder
Class of Stock
of Shares
Earl O. Bergersen
Class A voting common
56
Evelyn K. Bergersen
Class A voting common
56
Leslie A. Bergersen
Class B voting common
5
Class C nonvoting common
271
Lauren M. Bergersen
Class B voting common
5
Class C nonvoting common
177
Brian E. Bergersen
Class B voting common
5
Class C nonvoting common
115
Santos Ortiz
Class D nonvoting common
200
Thomas Sedwick
Class E nonvoting common
190
Although Ortho-Tain was authorized to issue shares of class F and class G nonvoting common stock, there were no shares of class F or class G nonvoting common stock outstanding. The corporation initially operated a facility in Winnetka, Illinois, but, soon after establishing Ortho-Tain, petitioners began considering relocating the business to Puerto Rico. Petitioners considered the *427 tax savings available by doing business overseas, particularly in Puerto Rico. Petitioners considered Puerto Rico most appealing because it was a possession of the United States, and petitioners eventually could live there and retain all the benefits of their U.S. citizenship. They also believed that Puerto Rico offers telephone and postal services, a sanitation system, and other amenities comparable to those in the United States. Petitioners were also aware that if they became residents of Puerto Rico, their income from Puerto Rican sources would be exempt from U.S. income tax. The Puerto Rican Economic Development Administration (the EDA) encouraged petitioner to locate his manufacturing operation in Puerto Rico. An official with the EDA escorted petitioners around the island over a 2-week period, showing them the various potential areas where they could establish a facility. Petitioners decided to locate their business in Toa Alta, a suburb of San Juan, Puerto Rico. In 1976, petitioners moved Ortho-Tain's plant operations to Puerto Rico, and the corporation elected under section 936 to be treated as a possessions corporation for U.S. income tax purposes. Ortho-Tain received a *428 15-year grant of industrial tax exemption from the Puerto Rican Government, with an effective date of January 1, 1977. Ortho-Tain is a calendar-year, accrual-basis taxpayer. In 1976, Ortho-Tain hired Santos Ortiz (Mr. Ortiz), a plastics technician, as its plant manager at the Toa Alta facility. Mr. Ortiz continues to serve in that position to the present time. Prior to joining Ortho-Tain, Mr. Ortiz had been employed by Comel International and Proctor Silex as a plastics technician and a production manager in Puerto Rico. Ortho-Tain made its first product shipments from Puerto Rico in July of 1976. Since 1976, Ortho-Tain has manufactured its products at the Toa Alta, Puerto Rico, factory. The Food and Drug Administration registered Ortho-Tain's factory as an approved manufacturer in December of 1977. In November of 1979, Ortho-Tain hired Thomas Sedwick (Mr. Sedwick) as its tool and die maker at the Toa Alta facility. Mr. Sedwick continues to serve in that position to the present time. Prior to joining Ortho-Tain, Mr. Sedwick had been the co-owner of Matrix Tooling, an unrelated tool and die business in Bensenville, Illinois. Petitioner turned over the day-to-day operations of Ortho-Tain *429 to Mr. Ortiz and Mr. Sedwick. Petitioner considers these two men and their skills to be extremely valuable to Ortho-Tain and trusts their honesty and integrity. During the years at issue, petitioner held telephone conferences with Mr. Ortiz and Mr. Sedwick on a weekly or biweekly basis and visited the Toa Alta facility on a quarterly basis. Petitioner retained control of Ortho-Tain's finances, writing all checks on behalf of Ortho-Tain based upon accounts payable data provided by Mr. Ortiz. See infra note 19. Ortho-Tain's Products
During the taxable years at issue, Ortho-Tain's two major products were the Positioner and the Occlus-o-Guide. Both products are functional orthodontic appliances that are used to adjust and/or maintain the position of teeth. OTE and Ortho-Tain introduced these products between the late 1960's and the early 1980's. They are mass-produced, preformed products that are manufactured in a variety of specific sizes that can be used without further customized fitting. Petitioner invented the Positioner in 1964. The Positioner is a prefabricated retainer appliance, made of injection-molded plastic and used by orthodontists to finish the treatment of *430 a patient after the removal of braces. This invention was intended to eliminate the need for the custom molding and fitting of retainers typically used by orthodontists in finishing orthodontics treatment. Petitioner designed three series of Positioners to take into account the removal of some or all of a patient's bicuspids and a variety of sizes within each series to take into account variations in mouth size. Petitioner also invented a method for measuring a patient's mouth to determine the appropriate size within the relevant Positioner series that would fit the patient. Petitioner designed a flexible ruler for purposes of measuring mouth size. Over the years, petitioner obtained several U.S. patents relating to the Positioner. One patent covers the basic design of the Positioner, another patent covers an improvement of the Positioner to correct overbites and open-bite tendencies, and another patent relates to the material used to manufacture the Positioner. The plastic used to make the Positioner changes in opacity (from transparent to opaque) as a result of a chemical reaction with the patient's saliva. As a result, a dental professional can measure the frequency of the patient's *431 use of the device by observing the opacity of the Positioner. The "Ortho-Tain Positioner" is a registered trademark. In the early 1970's, petitioner invented a second prefabricated dental device, the Occlus-o-Guide, for use in young, preorthodontic children (usually ages 8 to 12). This device, described as a myofunctional eruption guidance appliance, is designed to correct the alignment of teeth as they erupt, and, in many cases, eliminate the need for braces. Petitioner designed the Occlus-o-Guide as a means of correcting overbite or overjet problems that otherwise would need to be corrected through the use of standard orthodontic braces. Petitioner designed three series of the Occlus-o-Guide, with a variety of sizes in each series. Petitioner designed a flexible ruler to measure the patient's mouth for the specific size in the appropriate series. Petitioner obtained a U.S. patent on the Occlus-o-Guide in 1979. The "Occlus-o-Guide" is a nonregistered, common law trademark. Ortho-Tain manufactures the Positioner and the Occlus-o-Guide by using a customized injection-molding process on granular plastics. The raw material, polyvinyl chloride (PVC), utilized to make the Positioner *432 and the Occlus-o-Guide is purchased from unrelated vendors. Mr. Ortiz is responsible for the specification of the different grades of PVC used by Ortho-Tain. Ortho-Tain uses polypropelene pellets to manufacture the individual plastic containers in which its products are shipped and stored. Ortho-Tain owns over 80 different proprietary molds or dies that it uses to produce the various series and sizes of the Positioner and the Occlus-o-Guide. Ortho-Tain owns and operates a grinder, a tumbling mixer, one dehumidifier, and three dehumidifying ovens, which are used to prepare raw materials for the injection-molding process. The corporation has one vertical injection-molding machine that it acquired from the equipment manufacturer, New Britain Company, at the start-up of production in 1976. A portable chiller is used to control hydraulic oil temperature parameters in the injection-molding equipment. Ortho-Tain uses a dual-zone temperature control unit to control pressure parameters in the injection-molding equipment. Mr. Sedwick designed and developed a custom-made rotating drilling machine and drilling fixtures to drill uniform and precise breathing holes in those Positioners and Occlus-o-Guides *433 that have the breathing-hole feature. Ortho-Tain's Marketing Procedures
Ortho-Tain used quite different marketing procedures for the Positioner as contrasted to the Occlus-o-Guide. The customer base for the Positioner consists primarily, if not exclusively, of orthodontists. After developing the product in the late 1960's, petitioner mailed samples to 4,000 to 5,000 members of the American Association of Orthodontists (AAO), together with product descriptions and order cards. After Ortho-Tain began operations in the mid-1970's, the corporation periodically sent similar mailings of product literature and order cards to U.S. and Canadian orthodontists listed as members of the AAO. Thus, marketing activities for the Ortho-Tain Positioner were limited to mass mailings and to Mrs. Bergersen's setting up a display booth at the annual AAO convention. Ortho-Tain did not use media advertising to promote the Positioner. Petitioner did not need to present seminars or prepare literature on the use of the Positioner because, by virtue of their training, orthodontists already possessed the knowledge necessary to properly put to use this device. In contrast, the market for the Occlus-o-Guide *434 consists of dentists. Ortho-Tain promoted the Occlus-o-Guide primarily in the United States through a combination of advertisements and publications in dental journals and direct contacts with dentists. Ortho-Tain also ran a media campaign directed to the general public to encourage parents to ask their dentists about the Occlus-o-Guide. Ortho-Tain contracted with an independent company, Northwest Mailers of Chicago, for direct mailings to dentists. Northwest Mailers used commercially available mailing lists of dentists to mail product descriptions and order forms on a semi-annual basis. During the mid-1980's, petitioner also published several short articles in various dental journals, discussing the treatment of patients with such orthodontic-guidance appliances. Mrs. Bergersen also set up display booths at the annual convention of the American Dental Association and at the annual meetings of several regional dental associations. In addition, because the Occlus-o-Guide is a form of orthodontic treatment and dentists generally do not receive orthodontic training in dental school, petitioner presented 1- or 2-day seminars to provide technical information about the Occlus-o-Guide, *435 how to identify appropriate cases in which to use the product, how the product should be used, and how to encourage patient acceptance of the product. Petitioners were heavily involved in such seminar activities during the years before the Court. [6] Petitioner conducted these seminars through his Dental Lectures Corporation (DLC) [7] or the United States Dental Institute (USDI). USDI was an unrelated organization that sponsored seminars on a variety of professional subjects for dentists around the country. During each of the years at issue, petitioner gave about 25 such seminars. Dentists paid a fee of $ 100 or more to attend a seminar and rarely attended more than one seminar. During the years at issue, petitioner did not give any lectures outside of North America relating to any of Ortho-Tain's products. *436 In addition to Ortho-Tain's mailing literature to prospective customers, Mrs. Bergersen would distribute Ortho-Tain product pamphlets and literature at seminars conducted by petitioner and at various professional conventions. At petitioner's seminars, Mrs. Bergersen would set up a table outside of the seminar room. She would also set up a table or booth at the professional conventions that petitioner attended annually. Ortho-Tain's financial statements reflect that it incurred costs (designated as Exhibits and Shows) in the amounts of $ 24,930 in 1985, $ 38,044 in 1986, and $ 28,938 in 1987, relating to petitioners' attendance at these various professional conventions. Approximately 90 percent of Ortho-Tain's total dollar sales were by mail order directly to customers in North America. The remaining sales were to unrelated dental supply houses in Europe, Australia, Japan, and South Africa. Substantially all of the products that Ortho-Tain sold to foreign dealers were Ortho-Tain Positioners. Individual customers and distributors placed purchase orders directly with Ortho-Tain. At the Toa Alta plant, Ortho-Tain personnel would process the orders, pick and pack the inventory, calculate *437 the applicable sales revenue, sales tax, and freight charges, prepare the shipping documentation, and ship the products. Ortho-Tain continues to manufacture and sell petitioner's inventions. During the years at issue, Ortho-Tain was the smallest section 936 possessions corporation in operation in Puerto Rico. [8] Ortho-Tain employed (including Messrs. Ortiz and Sedwick) 12 individuals in 1985, 13 in 1986, and 9 in 1987 at its Toa Alta facility. Ortho-Tain had one major competitor for the Positioner and no competitors for the Occlus-o-Guide. Ortho-Tain's sales grew from $ 600,000 in 1977 to $ 1.2 million in 1987, and Ortho-Tain accumulated substantial amounts of undistributed earnings and profits over that same period. Petitioners' Move to Puerto Rico
In the mid-1960's, *438 petitioners purchased the Winnetka house, a 5,000-square-foot, 11-room southern colonial house situated on a three-quarter acre lot in the Hubbard Woods neighborhood of Winnetka, Illinois. Petitioners reared their three children in that house, and the Winnetka house was their principal residence until November 1, 1985. In the late 1970's and early 1980's, changes began to occur for both Ortho-Tain and petitioners. As Ortho-Tain's operations in Puerto Rico became more and more successful, petitioners began to consider moving to Puerto Rico. Petitioners had spent their honeymoon in Puerto Rico and enjoyed the tropical climate. They regarded Puerto Rico as a lovely place in which to retire. Petitioners were also aware that, by becoming residents of Puerto Rico, they would be eligible for certain tax benefits under section 933, which would exempt their Puerto Rican source income from U.S. income tax. Specifically, petitioners were aware that as Puerto Rican residents they could receive dividends from Ortho-Tain that would be exempt from U.S. income tax. Although petitioners initially looked at houses and visited schools in Puerto Rico in the late 1970's, they decided at that time that *439 the changes in school, language, and culture would be too difficult for their children. Therefore, petitioners delayed their move until their youngest child, Brian, completed his high school education in Illinois. Petitioners' three children were living independently, either working or attending college, during the years at issue. On September 15, 1981, petitioners purchased land, located at 22 Dorado Beach Estates, Dorado Beach, Puerto Rico, for $ 120,000 (the Dorado Beach property). The Dorado Beach property is located on the grounds of the Dorado Beach Country Club, the site of the old Rockefeller mansion and one of the premier communities in Puerto Rico. Petitioners have paid Puerto Rican real property taxes on the Dorado Beach property since its purchase in 1981. Between 1981 and 1984, petitioners retained architects and engineers and drafted elaborate construction plans to build a 15,000-square-foot, 22-room house on the Dorado Beach property (the Dorado Beach house). Petitioners personally designed many features of the Dorado Beach house, including structural modifications to protect against hurricanes, improve cross-ventilation, and reduce tropical sun damage. They also *440 designed several rooms in the house to accommodate their artwork and hobbies and professional activities, such as a jewelry workshop for Mrs. Bergersen, a sculpture studio, and a study room for research for petitioner, as well as two rooms equipped with audio-visual equipment, screens, and chairs to accommodate petitioner's seminars. [9]
Petitioners obtained from the Commonwealth of Puerto Rico a construction permit, dated May 8, 1984, for the construction of the Dorado Beach house. Petitioners hired Martin & Associates to oversee the actual construction of the house. Mr. Tony Martin supervised the construction. Construction of the 22-room, 15,000-square-foot house began in 1984 and was scheduled to be completed *441 in late 1985, with initial cost estimates ranging from $ 500,000 to $ 750,000. Due to construction delays, the final cost of the Dorado Beach house was in the $ 1.5 to $ 2 million range. In 1984, petitioners began to plan their professional and personal transition to Puerto Rico. Petitioner sought to ease himself out of his orthodontics practice by a long-range plan for selling it. In April of 1984, petitioner entered into a 10-year employment and partnership arrangement with Dr. Joseph Scott (Dr. Scott) in regard to petitioner's orthodontics practice in Winnetka. During the first 5 years of the contract, Dr. Scott essentially was to be an employee and received a yearly salary and paid vacation but no equity in the practice. During that time, petitioner retained full management responsibility for the practice. For the remaining years of the contract, Dr. Scott was to receive more responsibility and equity in the practice and no salary. Petitioner cut down on his day-to-day practice of orthodontics after entering into the contract with Dr. Scott. After a 6-month transition period, petitioner spent 1 or 2 days per month in the office and limited his practice to examining existing patients *442 being treated with prefabricated appliances. In July of 1985, petitioners listed their Winnetka house for sale. After only 1 day on the market, petitioners contracted to sell it for $ 545,250. Petitioners had a basis of $ 77,500 in the Winnetka house. The Winnetka house had been petitioners' principal residence for purposes of section 1034 prior to its sale. Petitioners purchased a partially furnished 2,400-square-foot townhouse located on Wildberry Drive in Glenview, Illinois (the Glenview townhouse). In September of 1985, prior to the closing on the sale of the Winnetka house, petitioners contracted to purchase the Glenview townhouse for $ 229,800. Petitioners had occupancy rights in the Glenview townhouse as of October 26, 1985, and actually moved certain belongings into the townhouse around that date. Under their purchase contract, both petitioners and the seller had the option of rescinding the Glenview townhouse sale until March 26, 1986. During the option period, petitioners paid $ 1,400 per month to the seller and received credit toward the purchase price. Had petitioners not followed through with the purchase, the seller was entitled to retain those monthly payments, but *443 petitioners did complete the purchase of the Glenview townhouse in March of 1986. Cook County, the Illinois county in which the Glenview townhouse is located, grants a homestead exemption from the tax base used to compute property taxes if a property owner uses the property as his or her principal residence. Petitioners never have claimed this homestead exemption for the Glenview townhouse. Petitioners chose the Glenview townhouse because there was no maintenance that they had to perform (e.g., snow shoveling or yard work). Six townhouses were attached together in petitioners' section, and, as a result, petitioners were not afraid of break-ins while they were not there. Petitioners felt they could just lock the door and leave without worry. In April of 1986, petitioners paid $ 6,000 for membership and were accepted into a social membership at the Valley Lo Club Association, Inc. (Valley Lo Club), in Glenview, Illinois. Valley Lo Club was part of the Glenview townhouse complex. Petitioners joined Valley Lo Club for convenience because they did little entertaining in the Glenview townhouse which was considerably smaller than the Winnetka house. [10] Petitioners and their children *444 often dined at the Valley Lo Club restaurant when they were in the Chicago area visiting family, conducting case study research and seeing patients at the Winnetka office, or staying there between their frequent seminars. Petitioners closed the sale of the Winnetka house on November 1, 1985. The Dorado Beach house was far from complete at that time. In addition to purchasing the Glenview townhouse in Illinois, petitioners sublet from Mr. Sedwick a penthouse apartment on Condado Avenue in Santurce, Puerto Rico (the Condado apartment), from November of 1985 through October of 1986. [11]
*445 Petitioners' move from the Winnetka house to Puerto Rico occurred in stages over a long period. In November of 1985, petitioners hired Pickens Kane, a moving and storage company in Chicago, Illinois, [12] to move their belongings from the Winnetka house. Petitioners moved their belongings from the Winnetka house to four different locations: some to the basement and garage of the Glenview townhouse, some to the Condado apartment, some to Ortho-Tain's Toa Alto plant, and some to a commercial storage facility in Northbrook, Illinois. Although petitioners rented the Condado apartment in November of 1985, they maintained substantial contacts with Illinois for the *446 rest of 1985 and 1986. Petitioners initially spent 2 weeks in the Condado apartment in November of 1985 and then returned to the United States to attend a convention, co-host a 60th wedding anniversary party for petitioner's parents, and spend the holidays in the Chicago area with their children, other family members, and friends. Petitioners returned to the Condado apartment in late January of 1986. In 1986 and 1987, petitioners divided their time between Puerto Rico and the United States, 108 days in Puerto Rico in 1986 and 93 in 1987. When in Puerto Rico, petitioners spent some time observing the construction of the Dorado Beach house. Petitioners spent most of their time in the United States, giving seminars and lectures, attending conventions, visiting family, conducting the orthodontics practice, and purchasing items for the Dorado Beach house. In 1986 they also interviewed Iowa farm couples for household staff positions in the Dorado Beach house. [13]
*447 In the summer of 1986, much construction on the Dorado Beach house remained to be completed. However, the housekeeper's quarters and one of the smaller bedrooms were finished. The house had operational plumbing, electricity, and kitchen facilities, except for the refrigerators. Petitioners obtained ice from the Dorado Beach Country Club. Although petitioners continued their frequent travels, when they were in Puerto Rico after about August of 1986, they sometimes slept in the smaller bedroom at the Dorado Beach house. [14] They also continued to rent the Puerto Rican apartment through October of 1986. The farm couple petitioners had hired, William and Coryl Eberle, moved into the Dorado Beach house about August of 1986. [15] *448 Pickens Kane had shipped some of petitioners' furniture and furnishings to Puerto Rico in October of 1985, and in late October of 1986 shipped some more. [16]
In 1986, petitioners activated their membership in the Dorado Beach Country Club for which they had paid the initiation fee in 1983. Petitioners shipped a Mercury Cougar automobile to Puerto Rico in August of 1986. They registered the automobile in Puerto Rico in September of that year. Petitioners obtained an occupancy permit for the Dorado Beach house on January 14, 1987. However, construction continued on the Dorado Beach house until August of 1987. Puerto Rican labor and materials costs for construction of the Dorado Beach house were paid by the construction supervisor, Mr. Tony Martin, from a construction bank account petitioner maintained in his and Mr. Martin's name. Mr. Martin wrote all of the checks drawn on the construction account and paid these costs as follows: 1985 Month
No. of Checks
Amounts Jan.
45
$ 29,569.50 Feb.
62
33,059.05 March
56
22,057.11 April
55
36,190.44 May
61
31,761.14 June
50
19,422.92 July
50
39,806.78 Aug.
53
41,244.73 Sept.
56
22,475.73 Oct.
35
27,021.31 Nov.
69
30,748.74 Dec.
40
53,987.61 Total:
632
$ 387,345.06
1986 Month
No. of Checks
Amounts Jan.
55
$ 21,799.51 Feb.
75
31,588.79 March
51
27,709.31 April
94
21,815.02 May
74
47,258.75 June
81
28,006.66 July
54
21,737.44 Aug.
72
26,222.71 Sept.
90
24,443.66 Oct.
55
75,958.30 Nov.
66
22,455.97 Dec.
97
25,691.63 Total:
864
$ 374,687.75
1987 Month
No. of Checks
Amounts Jan.
130
$ 26,558.85 Feb.
122
19,366.16 March
119
24,124.51 April
94
14,719.81 May
100
15,723.03 June
88
18,548.09 July
120
11,347.39 Aug.
41
6,110.74 Sept.
51
6,982.74 Oct.
1
322.08 Nov.
-0-
-0- Dec.
-0-
-0- Total:
866
$ 143,803.40
*449 In addition, petitioners directly incurred expenses to acquire outside of Puerto Rico fixtures, furniture, and artwork for the Dorado Beach house. Petitioners still own the Glenview townhouse, which is nicely furnished but not as opulent as the Dorado Beach house. Petitioners spent 107 days at the Glenview townhouse in 1986 and 138 in 1987. Petitioners continued to travel frequently during 1986 and 1987 in connection with petitioner's seminars and lecturing activities, oversight of their rental properties located in Texas, visits with family and friends, and infrequent examinations of patients in the Winnetka dental office. In 1986 petitioner saw dental patients on 18 days and in 1987 on 10 days. The relationship with Dr. Scott worked well for a few years. However, in October of 1987, petitioner fired Dr. Scott because he suspected that Dr. Scott had been removing dental records from the office in order to start a competing orthodontics practice. Thereafter, petitioner attempted to sell the practice. Although he received a number of responses to his advertisement to sell the practice, petitioner finally determined that the practice could not be sold. He began to refer substantially *450 all of his patients (except for a few patients whom he had been treating as research case studies) to other orthodontists and refused to take on new patients thereafter. During the taxable years 1986 and 1987, petitioners were in the following locations for the number of days stated: 1986
1987
Illinois
107
138
Puerto Rico
108
93
Elsewhere
150
134
Petitioners maintained bank accounts in various financial institutions in both the United States and in Puerto Rico. In February of 1987, petitioners replaced State of Illinois driver's licenses which they had apparently lost. Petitioner replaced another lost Illinois license in December of 1988. [17] Petitioners obtained Puerto Rican voter registration cards in 1988 and Puerto Rican driver's licenses in 1989. *451 The Dorado Beach house was completed in August of 1987 and was used by petitioners as their principal residence thereafter. In 1987 and in the years thereafter, petitioners spent the Christmas holidays in the Dorado Beach house. Since 1987, petitioner has conducted his scholarly research and writing in a room of the Dorado Beach house designed specially for that purpose, where he keeps his journals and other research records and performs dental tracings. Petitioner apparently has not been engaged in the active practice of orthodontics since late 1987. See supra note 6. At the time of the trial in this case, petitioners continued to reside in the Dorado Beach house. Petitioners' Contributions to and Withdrawals from Ortho-Tain
Ortho-Tain's financial statements reflect that petitioners provided funds to Ortho-Tain during the 1977 and 1978 taxable years. The financial statements reflect these funds as "advances from stockholders" and state that Ortho-Tain used the funds to construct its plant and to acquire its equipment. Ortho-Tain's financial statements for 1977 through 1987 reflect the following amounts as the yearend outstanding "advances from shareholders": Year
Year-End Balance
1977
$ 98,029
1978
161,675
1979
41,893
1980
41,893
1981
41,893
1982-1987
-0- *452 On its financial statements, Ortho-Tain reduced the "advances from stockholders" account in the amount of $ 119,782 in 1979 and in the amount of $ 41,893 in 1982. As petitioners shifted their focus to Ortho-Tain, the corporation became more and more profitable. Although Ortho-Tain's earnings steadily grew, petitioners did not receive any salaries from the corporation from 1977 through 1987 nor were any dividends declared on their stock until 1987. Ortho-Tain accumulated substantial amounts of undistributed earnings and profits in the period from 1977 through 1988 as follows: 1977
$ 346,983
1978
675,723
1979
941,698
1980
1,237,685
1981
1,442,861
1982
1,825,410
1983
2,306,163
1984
3,136,772
1985
4,113,833
1986
5,091,133
1987
3,150,518
1988
1,509,240
During the taxable years 1977 through 1986, Ortho-Tain paid dividends only to Mr. Ortiz and Mr. Sedwick as shareholders of stock classes D (Mr. Ortiz) and E (Mr. Sedwick). Petitioners were aware that the dividends paid to Messrs. Ortiz and Sedwick were exempt from U.S. income tax, and no dividends were declared for petitioners from 1977 through 1986 because they knew such dividends would be taxable to them. During *453 the taxable year 1987, Ortho-Tain paid dividends to petitioners, Mr. Ortiz, and Mr. Sedwick as shareholders of stock class A (petitioners), class D (Mr. Ortiz), and class E (Mr. Sedwick). The dividends paid by Ortho-Tain during the taxable years 1977 through 1988 were in the following amounts: Dividends
Dividends
Dividends
paid to
paid to
paid to
petitioners
Mr. Ortiz
Mr. Sedwick
Year
(Class A) [1]
(Class D)
(Class E)
1977
-0-   -0- -0-  1978
-0-   -0- -0-  1979
-0-   $ 5,000
-0-  1980
-0-   5,000
$ 12,570
1981
-0-   7,000
14,193
1982
-0-   9,500
15,648
1983
-0-   11,300
17,951
1984
-0-   9,500
19,988
1985
-0-   11,000
20,170
1986
-0-   12,100
21,390
1987
$ 2,799,500
13,300
21,417
1988
2,143,279
14,600
22,040
Although Ortho-Tain did not pay any salary or dividends to petitioners during the taxable years 1977 through 1986, petitioner individually withdrew large amounts of money from Ortho-Tain at regular intervals in the form of "loans". [18] The board *454 of directors of Ortho-Tain (composed of petitioner as chairman and Mrs. Bergersen as secretary) passed resolutions authorizing these loans to petitioner individually. The resolutions provided that the amount borrowed would be repaid by the end of the year in which it was borrowed or at the end of an extended period as negotiated. Each year, petitioner signed notes evidencing the amounts authorized and borrowed. At the end of each year, petitioner executed demand notes consolidating the outstanding balances of the individual notes executed during that year. The notes provided that principal, together with interest accruing at a specified annual rate, was payable to Ortho-Tain on demand. The notes charged interest at rates of 10 percent during 1982, 9 percent during 1983 through 1985, and 8.5 percent during 1986 and 1987. The notes were not collateralized. Ortho-Tain recorded the withdrawals as "demand notes receivable from officers/stockholders" in the "other assets" category of its audited financial statements for the 1982 through 1987 taxable years. *455 Petitioner withdrew funds from Ortho-Tain in the following amounts during the years indicated: Year
Amount Received
1982
$ 852,026
1983
447,635
1984
111,741
1985
812,557
1986
756,272
1987
699,861
Total
$ 3,680,092
In 1984, petitioner made a payment of $ 411,403 to Ortho-Tain pursuant to the terms of the outstanding notes. Petitioner made annual interest payments on these loans during the 1982 through 1987 taxable years. Petitioners deducted these interest payments on their 1982 through 1986 Federal income tax returns. Petitioners did not deduct the interest payment of $ 52,459 on their 1987 Federal income tax return. They have claimed the 1987 interest payment as a deduction for that taxable year in their petition. Ortho-Tain reported the payments received from petitioners as U.S. source interest income on its 1982 through 1987 Federal income tax returns. Ortho-Tain did not claim a possessions tax credit under section 936 and paid all Federal income tax due with respect to this interest income. Ortho-Tain did not file its Federal income tax returns for 1982 through 1987 until after the audit of petitioners' returns commenced. Prior to 1987, the only repayment *456 of principal was the $ 411,403 repaid in 1984. On March 27, 1987, Ortho-Tain's board of directors passed a resolution declaring a dividend to petitioners in the amount of $ 2,799,500. Ortho-Tain issued two checks, dated March 27, 1987, signed by petitioner and drawn on Ortho-Tain's account, each in the amount of $ 1,399,750. [19] One check was payable to Mrs. Bergersen, and one check was payable to petitioner. Petitioners deposited these checks into their personal account in Winnetka, Illinois. Petitioner then wrote his own check to Ortho-Tain in the aggregate amount of $ 2,799,500 to repay part of his outstanding principal loan owed to Ortho-Tain. Petitioner similarly repaid the remaining loan balance in 1988, after Ortho-Tain declared and distributed dividends to petitioners in the amount of $ 2,143,279. *457 In summary, during the taxable years 1982 through 1987, petitioner withdrew money from Ortho-Tain in the form of loans and made payments to Ortho-Tain in the form of principal and interest in the following amounts: Loan
Principal
Interest
Year
Amount
Paid
Paid
1982
$ 852,026
none   $ 68,832
1983
447,635
none   91,164
1984
111,741
$ 411,402
124,142
1985
812,557
none   146,723
1986
756,272
none   173,564
1987
699,861
2,799,500
52,459
Totals:
$ 3,680,092
$ 3,210,902
$ 656,884
During the years before the Court, petitioners had a net worth of about $ 15 million, including their rental properties in Texas, their stock in Ortho-Tain, and their other investments, including the $ 1 million in the DLC profit-sharing plan and trust. Late Filing of Petitioners' Returns
In 1981, petitioners retained Michael A. Moyski (Mr. Moyski), a certified public accountant in Wheaton, Illinois, to prepare petitioners' Federal income tax returns. Mr. Moyski prepared petitioners' returns from 1982 through the taxable years at issue. With respect to their 1983, 1984, and 1987 tax returns, petitioners properly executed and timely filed Forms 4868, Application *458 for Automatic Extension of Time to File U.S. Individual Income Tax Return (hereinafter Form 4868), and Forms 2688, Application for Additional Extension of Time to File U.S. Individual Income Tax Return (hereinafter Form 2688). Respondent granted petitioners' extension requests for each of those taxable years, thereby extending the due date of petitioners' returns for the taxable years 1983, 1984, and 1987 as follows: Year
Approval by Respondent
Extended Due Date
1983
August 17, 1984
October 15, 1984
1984
August 27, 1985
October 15, 1985
1987
September 6, 1988
October 15, 1988
Petitioners timely filed their tax returns for the taxable years 1983, 1984, and 1987 on or before the extended due dates. Petitioners properly executed and timely filed a Form 4868 prior to April 15, 1986, with respect to their 1985 Federal income tax return. The due date of petitioners' 1985 return was thereby automatically extended to August 15, 1986. In early August of 1986, Mr. Moyski discussed with petitioners the status of the preparation of their 1985 tax return. Due to delays in petitioners' sending to Mr. Moyski the relevant records for preparation of the return, Mr. Moyski advised petitioners *459 that an additional 2-month extension of time within which to file the return would be required. Petitioners authorized Mr. Moyski to file the required extension request. Mr. Moyski followed his office's established procedures for preparing and filing the extension requests. In August of 1986, Mr. Moyski completed the extension request Form 2688 for the 1985 tax return, signed the form, and gave the form to his receptionist to copy and mail. Petitioners filed their 1985 income tax return with the Internal Revenue Service Center in Kansas City, Missouri, on October 9, 1986. Petitioners properly executed and timely filed Form 4868 prior to April 15, 1987, with respect to their 1986 Federal income tax return. The due date of petitioners' 1986 return was thereby automatically extended to August 17, 1987. In early August of 1987, Mr. Moyski discussed with petitioners the status of the preparation of their 1986 tax return. Again, due to petitioners' delay in sending to Mr. Moyski the relevant records, Mr. Moyski advised petitioners that an additional 2-month extension of time within which to file the return would be required. Petitioners authorized Mr. Moyski to file the required extension *460 request. On August 13, 1987, Mr. Moyski's partner, Michael Celer, completed and signed a Form 2688 on behalf of petitioners for the 1986 tax return. Mr. Moyski reviewed the extension request form and then gave it to the receptionist to copy and mail. Petitioners filed their 1986 return with the Internal Revenue Service Center in Kansas City, Missouri, on October 15, 1987. They attached to their 1986 return a copy of the Form 2688, dated August 13, 1987, requesting a 2-month extension of time in which to file their 1986 return. Respondent did not notify petitioners that this extension request had been approved or denied. Mr. Moyski's office procedure did not require the use of certified mail for such documents. Other than through his knowledge of his office's standard procedures, Mr. Moyski does not have any personal knowledge that his receptionist mailed the extension requests for the taxable years 1985 and 1986. The receptionist did not testify at trial. Mr. Moyski does not have a copy of the Form 2688 for the taxable year 1985. A copy of the Form 2688 was not attached to petitioners' 1985 tax return. [20] A copy of a Form 2688 was attached to petitioners' 1986 tax return, but there *461 was no indication that such form had been approved or denied by the Internal Revenue Service. The Internal Revenue Service does not have any record of extension requests (Forms 2688) being filed by petitioners or on petitioners' behalf for the taxable years 1985 and 1986. OPINION Petitioners' Residency
Petitioners argue that they were residents of Puerto Rico, not of the United States, during all of 1986 and 1987. Thus, petitioners claim the exclusions from gross income provided by section 933. Respondent argues that, during the tax years at issue, petitioners continued to be residents of the United States at the Glenview townhouse in Glenview, Illinois. Section 933(1) provides that, in the case of an individual who is a bona fide resident of Puerto Rico "during the entire taxable year", income derived from sources within Puerto Rico shall not be included in gross income and shall be exempt *462 from U.S. income tax. An individual who takes up residence in Puerto Rico during the course of the taxable year is not entitled to the exclusion for that year. Vazquez v. Commissioner, T.C. Memo. 1993-368; Motion v. Commissioner, T.C. Memo. 1975-43; Sec. 1.933-1(a), Income Tax Regs.
Section 933 does not contain a definition of the term "bona fide resident" of Puerto Rico. However, the regulations under section 933 direct us to section 871 and the regulations thereto. Sec. 1.933-1(a), Income Tax Regs. Thus, this Court will analyze the facts and circumstances in each case and will apply the principles of sections 1.871-2, 1.871-3, 1.871-4, and 1.871-5, Income Tax Regs., in determining whether an individual is a bona fide resident of Puerto Rico. Sec. 1.933-1(a), Income Tax Regs.; cf. Preece v. Commissioner, 95 T.C. 594 (1990) (applying facts and circumstances test of section 1.871-2, Income Tax Regs., to determine whether the taxpayers in that case (U.S. citizens) were residents of the Commonwealth of the Northern Mariana Islands). Section 871 and the regulations under that section provide *463 rules for determining whether an alien individual is a resident of the United States. In Dawson v. Commissioner, 59 T.C. 264, 268 (1972), we noted that the principles to be applied in determining whether a U.S. citizen is a bona fide resident of a foreign country are the same as those that govern whether an alien is a bona fide resident of the United States. A nonresident alien is an individual whose residence is not within the United States and is not a citizen of the United States. Sec. 1.871-2(a), Income Tax Regs. An alien individual is a resident of the United States if he is actually present in the United States and is not a mere transient or sojourner, which depends upon his intentions as to the length and nature of his stay. Sec. 1.871-2(b), Income Tax Regs. The fundamental issue in determining residence is whether the alien intends to make the United States his home. See Jones v. Commissioner, 927 F.2d 849, 854 (5th Cir. 1991), revg. T.C. Memo. 1989-616; Dawson v. Commissioner, 59 T.C. at 268. Further, an alien who lives in the United States and has no definite *464 intention as to his stay is not a transient and is a resident for purposes of the income tax. Dawson v. Commissioner, supra at 268. In Sochurek v. Commissioner, 300 F.2d 34 (7th Cir. 1962), revg. and remanding 36 T.C. 131 (1961), the United States Court of Appeals for the Seventh Circuit applied these principles in determining whether a U.S. citizen was a resident of a foreign country. The Seventh Circuit held that an unmarried taxpayer who was a full-time news correspondent and who had established a temporary home in Singapore (and maintained it throughout the entire taxable year) was not a transient or sojourner but was a bona fide resident of a foreign country. The taxpayer was entitled to exclude from gross income the compensation he received from his employer during the taxable year. In determining whether the taxpayer had satisfactorily established his claim of bona fide residence in a foreign country, the Seventh Circuit enumerated various factors to be considered: (1) intention of the taxpayer; (2) establishment of his home temporarily in the foreign country for an indefinite *465 period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with his employment; (5) nature, extent and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; and (11) good faith in making his trip abroad; whether for purpose of tax evasion.
Sochurek v. Commissioner, 300 F.2d at 38. The Seventh Circuit further stated that "While all such factors may not be present in every situation, those appropriate should be properly considered and weighed." Id. This Court has accepted and applied these Sochurek factors in various contexts. *466 See Dawson v. Commissioner, 59 T.C. at 268-269 (whether a U.S. citizen was a resident of Australia for purposes of section 911(a)(1)); Schoneberger v. Commissioner, 74 T.C. 1016, 1023 (1980) (whether a U.S. citizen was a resident of France for purposes of section 911(a)(1)); Vazquez v. Commissioner, T.C. Memo. 1993-368 (whether a U.S. resident became a resident of Puerto Rico for purposes of section 933). Application of the Sochurek v. Commissioner factors is essentially tantamount to the facts and circumstances test mandated by the regulations applicable to section 933(1). Vazquez v. Commissioner, supra.
Petitioners are U.S. citizens and at this time are bona fide residents of Puerto Rico. Up to at least November of 1985, petitioners had been bona fide residents of the suburbs of Chicago, Illinois, for many years. By 1988 they no doubt were bona fide residents of Puerto Rico. In the murky period between those dates, we must decide when they abandoned their U.S. residency and became bona fide residents of Puerto Rico. "Intention carries great weight *467 in determining whether a residence once established has been abandoned." Marsh v. Commissioner, 68 T.C. 68, 71 (1977) (quoting Adams v. Commissioner, 46 T.C. 352, 361 (1966); emphasis in original). An individual may have more than one residence. Id. at 72; Jellinek v. Commissioner, 36 T.C. 826 (1961). Thus, the critical inquiry in this case is not whether petitioners have established Puerto Rican residency (they have), but rather when they ceased to be U.S. residents. Marsh v. Commissioner, supra at 72; Dillin v. Commissioner, 56 T.C. 228, 242 (1971). Respondent takes the position that petitioners clearly were residents of the United States during 1986 and 1987. Moreover, respondent argues that petitioners were not bona fide residents of Puerto Rico during 1986 and 1987 and that, if petitioners ever did establish Puerto Rican residency, such residency commenced well after 1988. Respondent contends that the Glenview townhouse became petitioners' new home after the sale of the Winnetka house. Respondent points to the *468 facts that petitioner maintained control of his orthodontics practice in Winnetka, that petitioners were accepted into a social membership at the Valley Lo Club, which was part of the Glenview townhouse complex, that petitioners maintained listings in the Illinois telephone directory, that they maintained bank accounts and driver's licenses in Illinois, and that they listed the Glenview townhouse address on their 1986 U.S. and Illinois tax returns. Respondent further contends that, as of January 1, 1987, petitioners were still in transition and not yet residents of Puerto Rico. Petitioners continued to receive mail at the Glenview townhouse address throughout this period, and petitioners did not receive Puerto Rican voter registration cards until 1988 and Puerto Rican driver's licenses until 1989. Finally, respondent argues that petitioners' purported Puerto Rican residency was "the linchpin of their longterm tax-avoidance scheme". Petitioners dispute respondent's contentions and argue that they established Puerto Rican residency in November of 1985 when they moved into the Condado apartment. Petitioners argue that they originally intended to establish residency in Puerto Rico in *469 the late 1970's, but for family considerations, they postponed the move. They point out that their most valuable assets and principal business interests (i.e., Ortho-Tain, DLC, and the $ 1 million profit-sharing plan and trust transferred from the orthodontics practice to DLC) were located in Puerto Rico and are strong evidence of their intent to move their home to Puerto Rico. Petitioners contend that delays in the construction of the Dorado Beach home required that they move into the Condado apartment temporarily while construction continued, but that they nevertheless commenced day-to-day living in Puerto Rico in November of 1985. They state that they continued to receive mail in Glenview, Illinois, because they could count on their older daughter, Leslie, to handle personal and business inquiries. Petitioners argue that they shed social and business ties in Illinois and developed social and business ties in Puerto Rico and that they never intended to make the Glenview townhouse their home. Petitioners contend that a physical comparison of the Glenview townhouse and the Dorado Beach house is the best evidence of their intent to reside in Puerto Rico. We agree that petitioners intended *470 to become Puerto Rican residents at some time, but the question is when they actually ceased to be bona fide U.S. residents and became bona fide residents of Puerto Rico. We think that determination depends upon something more than petitioners' mere self-serving assertions that they intended to became Puerto Rican residents when they rented the Condado apartment in November of 1985 or when they claim they "moved into" the Dorado Beach house in August of 1986. In applying the factors enumerated in Sochurek v. Commissioner, supra, we find conflicting factors to weigh and evidence pointing in both directions. Petitioners' situation is an unusual one due to the fact that for a lengthy period after they sold their Winnetka house, their long-time principal residence, in November of 1985, they were living in temporary quarters. Such temporary quarters included the Glenview, Illinois, townhouse that they purchased and still own, as well as the Condado apartment that they rented until October of 1986. Petitioners' situation is an unusual one also due to the amount of travel required by petitioners' business and lecturing activities during the years before *471 the Court. Thus, wherever petitioners' residence was, they would be spending a lot of time away from it. Petitioners' personal and professional transition to Puerto Rico occurred over a long period of time, and their "move" to Puerto Rico also occurred in stages over several years. Although we are convinced that petitioners were operating under an intention to make Puerto Rico their permanent home someday, a taxpayer's established residence is presumed to continue until it is shown to have been abandoned. Craig v. Commissioner, 73 T.C. 1034, 1038 (1980); Friedman v. Commissioner, 37 T.C. 539 (1961). We are not convinced that petitioners were ready to abandon their Illinois residence in November of 1985 or during at least the first half of 1986. In an unconvincing effort to establish residence in Puerto Rico, petitioners "moved into" the Condado apartment in November of 1985. At that time completion of their Dorado Beach house was a year and a half away. After remaining in the Condado apartment only 2 weeks in late 1985, petitioners returned "home" [21] to celebrate the holidays with family members. Petitioners did not return *472 to Puerto Rico until late January of 1986. Thus, we are satisfied that petitioners were not residents of Puerto Rico for the full year 1986. However, circumstances changed somewhat by August of 1986. Some parts of petitioners' 22-room Dorado Beach home could be occupied, the housekeeper's quarters, the kitchen, and one of the smaller bedrooms. Petitioners hired the Eberles to take care of the house. The Eberles actually moved into the house in August of 1986. Petitioners may have slept in the small bedroom on occasions when they were in Puerto Rico after August of 1986. Having purchased a membership in 1983, petitioners activated that membership in the Dorado Beach Country Club in 1986. By the end of the year, some more of their furnishings *473 and belongings remaining in Illinois had been shipped and moved into the Dorado Beach house. The record does not establish when all of their furniture and furnishings finally arrived. We cannot find that petitioners "moved into" the Dorado Beach house in August of 1986 as they claim. Substantial amounts of construction work remained, and the house was not completed until August of 1987. [22] While the Glenview townhouse was modest compared to the opulence of the Dorado Beach house (once it was completed), as petitioners point out, nonetheless that was not the situation in August of 1986. The comparison then was between a nicely furnished, though modest, townhouse, and a 22-room house under construction, with only the housekeeper's quarters, kitchen, and one small bedroom completed. Again, as in the case of their alleged "move" into the Condado apartment in November of 1985, we cannot accept petitioners' mere self-serving declaration of their intent or their characterization of the events. We cannot find that petitioners had abandoned their U.S. residency at that time and had become bona fide residents of Puerto Rico. *474 For both 1986 and 1987 petitioners spent far more time in the United States than in Puerto Rico. In fact, they spent about as much or more time at the Glenview townhouse than in Puerto Rico. In 1986 they were in the Glenview townhouse for 107 days and were in Puerto Rico for 108; in 1987 they were in the Glenview townhouse for 138 days and in Puerto Rico for 93 days. We cannot find that petitioners had abandoned their U.S. residency and had become bona fide residents of Puerto Rico in 1986. We cannot find that petitioners were bona fide residents of Puerto Rico "during the entire taxable year" for either 1986 or 1987. An occupancy permit for the Dorado Beach house was issued by Puerto Rico on January 14, 1987. All construction on that house was essentially completed by August of 1987. Although there is no specific date the Court can point to as to when petitioners finally abandoned their U.S. residency and became bona fide Puerto Rican residents, the completion of what Mrs. Bergersen called her "dream" house is a logical latest date. She and petitioner had waited a long time for their dream home, and that house was thereafter their principal residence, even though they continued *475 to retain and use a second residence in Illinois. Petitioners' principal furniture, furnishings, and artwork were in that house. The house was designed to bring together their personal hobbies and their professional interests. Their lives became centered in that house, where, once petitioner basically retired and closed down his orthodontics practice later that year, his professional research and writing was carried on. Petitioners and their family celebrated Christmas in that house in 1987 and in subsequent years. Petitioners still reside in that house and still own the Glenview townhouse. Again, one must look at the intent of the taxpayer when determining residency, both its establishment and its abandonment. Friedman v. Commissioner, supra. Once petitioners moved into the Dorado Beach house by August of 1987 and began utilizing it for personal and professional reasons, we think they then intended to abandon their U.S. residency. The Court is satisfied that by August of 1987 petitioners' subjective intention as to their residency in Puerto Rico meshed with the objective reality of their lives. The Court finds that at that time they intended to and *476 did abandon residency in the United States, and they intended to and did become bona fide residents of Puerto Rico. We are mindful that petitioners still continued their extensive travels for seminars, lectures, and conventions in the United States for the rest of that year. We have held that the mere fact of absence from a residence, once established, for even relatively long periods of time does not, of itself, destroy that residency for tax purposes. Craig v. Commissioner, 73 T.C. at 1038; Friedman v. Commissioner, supra. Although petitioners continued to visit the United States for business reasons, to visit family members and friends living in Illinois, or as a stopover between business trips, they did not intend to remain residents of Illinois, and they did not intend to abandon their residency in Puerto Rico when visiting or traveling through Illinois. We are also mindful that there were a few matters yet to be attended to--closing down the orthodontics practice, which after the firing of Dr. Scott in October of 1987 was accomplished relatively expeditiously by the end of the year, registering to vote in Puerto *477 Rico which occurred in 1988, and obtaining Puerto Rican driver's licenses which occurred in 1989. However, we reject respondent's contentions that petitioners did not become residents of Puerto Rico until 1988 or 1989. Petitioners have not hidden the fact that part of their motivation for moving to Puerto Rico and establishing residency there was to take advantage of the income exclusion provisions of section 933. This factor, albeit an important one, nevertheless must be weighed with other factors, such as that petitioners actually did construct their dream home in Puerto Rico, with accommodations for their personal and professional goals, that they moved predominantly all of their belongings to Puerto Rico, and that they began to assimilate themselves into their new community and break ties with their old community. We agree that they did all this, but we conclude it occurred later than petitioners say, in 1987 rather than in 1985 or 1986. Therefore, we hold that petitioners were not bona fide residents of Puerto Rico for the full taxable year 1987 and thus are not entitled to the applicable exclusions of section 933(1) for that year. Petitioners' Sale of the Winnetka House
*478 Section 1034(a) defers recognition of gain realized on the sale of a taxpayer's principal residence if the taxpayer purchases and uses a new principal residence within 2 years of the sale of the old residence. A new residence that is constructed or reconstructed by a taxpayer is treated as purchased by the taxpayer. Sec. 1034(c)(2). Section 1034(a) also provides that gain realized from the sale of an old residence shall be recognized only to the extent that the taxpayer's adjusted sales price of the old residence exceeds the taxpayer's cost of purchasing the new residence. Respondent has determined that, for purposes of section 1034, petitioners' new principal residence was the Glenview townhouse. Respondent, thus, determined that petitioners should have recognized gain on the sale of the Winnetka house to the extent the sale price of the Winnetka house exceeded the cost of the Glenview townhouse. Petitioners argue that the Dorado Beach house became their principal residence when they moved into it in August of 1986 and that the Glenview townhouse was never intended to be their new principal residence. [23] Whether a property is used as a principal residence depends upon all of the *479 facts and circumstances of each case, including the good faith of the taxpayer. Thomas v. Commissioner, 92 T.C. 206 (1989); Sec. 1.1034-1(c)(3)(i), Income Tax Regs. "[A] new residence must be lived in or physically occupied, on or prior to the post-sale deadline date." Bayley v. Commissioner, 35 T.C. 288, 297 (1960). The Puerto Rican residency issue under section 933(1) colored *480 and perhaps distorted the parties' analysis of the section 1034 rollover issue. Respondent's argument that the Glenview townhouse became petitioners' new principal residence, while perhaps a factor to be considered for the section 933(1) issue, [24] is not determinative for the section 1034(a) rollover issue. Section 1034(c)(4) provides: If the taxpayer, during the period described in subsection (a), purchases more than one residence which is used by him as his principal residence at some time within 2 years after the date of the sale of the old residence, only the last of such residences so used by him after the date of such sale shall constitute the new residence. * * * [Emphasis added.]
The Winnetka house, the old principal residence, was sold on November 1, 1985. Petitioners were living in the Dorado Beach house as their principal *481 residence no later than August of 1987 when all construction on that house was completed. That was within 2 years of the date of sale of the Winnetka house. Under section 1034(c)(4), the Dorado Beach house constitutes the new residence. Thus, whether or not petitioners purchased and used the Glenview townhouse as their principal residence for a time after the sale of the Winnetka house, and we think they did, petitioners are still entitled to defer recognition of the gain on that sale. See supra note 23. The Dorado Beach house is the "new residence" for purposes of the section 1034 rollover of gain on the sale of a principal residence. Therefore, we hold that petitioners can defer recognizing the gain realized on the sale of the Winnetka house under the provisions of section 1034. Cash Withdrawals from Ortho-Tain as Loans, Constructive Dividends, or Compensation
For the taxable years 1985, 1986, and 1987, petitioner withdrew cash from Ortho-Tain in the amounts of $ 812,557, $ 756,272, and $ 699,861, respectively. Petitioners characterize these withdrawals as "loans". Respondent recharacterizes these "loans" as constructive dividends or, in the alternative, compensation *482 for services. Respondent correspondingly has disallowed petitioners' deductions of interest paid to Ortho-Tain, in the amounts of $ 146,723, $ 173,564, and $ 52,459, respectively. Respondent does not challenge that petitioners made such payments to Ortho-Tain: the deductions of interest were disallowed on the ground that the loans were not bona fide debt. Sections 301 and 316 provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of the corporation's earnings and profits. [25] "A constructive dividend is paid when a corporation confers an economic benefit on a stockholder without expectation of repayment." Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306 (quoting Wortham Machinery Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975)). *483 The first consideration in determining whether a shareholder's withdrawals from a corporation constitute loans or constructive dividends is whether, at the time of the withdrawals, the shareholder intended to repay the amounts received and the corporation intended to require repayment. Miele v. Commissioner, 56 T.C. 556, 567 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973). [26] Respondent's determination that the withdrawals constitute constructive dividends, and therefore taxable income, is presumptively correct, and petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Miele v. Commissioner, supra at 567. A court may look to various factors *484 to determine intent to repay, but once the taxpayer's intent is found, that finding is conclusive of the legal issue of loans versus dividends. Busch v. Commissioner, 728 F.2d 945, 948-949 (7th Cir. 1984), affg. T.C. Memo. 1983-98. In Commissioner v. Duberstein, 363 U.S. 278, 290-291 (1960), the Supreme Court held that the issue of a taxpayer's intent was a question of fact. This conclusion led a number of circuits to hold that the issue of taxpayer intent in the context of loan versus dividend is a question of fact. [27] See Estate of Taschler v. United States, 440 F.2d 72, 75 (3d Cir. 1971); Tollefsen v. Commissioner, 431 F.2d 511, 513 (2d Cir. 1970), affg. 52 T.C. 671 (1969); Berthold v. Commissioner, 404 F.2d 119, 121 (6th Cir. 1968), affg. T.C. Memo. 1967-102; Chism's Estate v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. T.C. Memo. 1962-6; cf. United States v. Pomponio, 563 F.2d 659, 662 (4th Cir. 1977) *485 (appeal of criminal conviction for tax evasion). Contra Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306; Alterman Foods, Inc. v. United States, 505 F.2d 873 (5th Cir. 1974). *486 The issue of taxpayer intent in the loan versus dividend context is a question of fact and, even though one must look at objective facts to determine intent, it is the taxpayer's actual intent or actual motive with which the court is concerned. Busch v. Commissioner, 728 F.2d at 949; see also Livernois Trust v. Commissioner, 433 F.2d 879, 883 (6th Cir. 1970), affg. T.C. Memo. 1969-111; Berthold v. Commissioner, 404 F.2d at 121; cf. United States v. Pomponio, 563 F.2d at 662. Establishing the taxpayer's intent by direct evidence is extremely difficult. Dean v. Commissioner, 57 T.C. 32, 43 (1971). Consequently, we must consider the taxpayer's testimony that he intended to repay, although such testimony is not determinative, and must consider objective factors to determine whether a withdrawal constitutes a loan or a dividend. The following objective factors are often considered in deciding whether shareholder withdrawals from a corporation are loans or constructive dividends: the extent of shareholder *487 control of the corporation; the retained earnings and dividend history of the corporation; the size of the withdrawals; the presence of conventional indicia of debt, such as promissory notes, collateral, and provision for interest; treatment of advances in corporate records; the history of repayment; and the taxpayer's use of the funds. Busch v. Commissioner, 728 F.2d at 948; see also Alterman Foods, Inc. v. United States, 505 F.2d at 877 n.7 and cases cited therein. Other objective criteria include "whether the corporation imposed a ceiling on the amounts that might be borrowed, whether there were definite maturity dates, attempts to force repayment, intention or attempts to repay, and the shareholder's ability to liquidate the loan." Williams v. Commissioner, 627 F.2d 1032, 1035 (10th Cir. 1980) (quoting Dolese v. United States, 605 F.2d 1146, 1153 (10th Cir. 1979). None of these factors, standing alone, is determinative of the issue before us. Alterman Foods, Inc. v. United States, 505 F.2d at 876-877 n.6. However, these factors *488 are useful in determining whether there is a true intention to repay. Courts have always examined transactions between closely held corporations and their shareholders with special scrutiny. Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion sub nom. Jiminez v. Commissioner, 496 F.2d 876 (5th Cir. 1974). Petitioners controlled Ortho-Tain and made the decisions as to the timing, amounts, and uses of the funds withdrawn. Petitioners did not receive any salaries or any dividends from Ortho-Tain from 1978 through 1986. They caused Ortho-Tain to declare dividends for Mr. Ortiz and Mr. Sedwick because they knew such dividends would be exempt from U.S. income tax because those employees were residents of Puerto Rico. Conversely, petitioners did not cause Ortho-Tain to declare any dividends for themselves during the years 1978 through 1986 because they knew such dividends would be taxable to them. In the case at hand, we are convinced that petitioners' actual motive or intent in withdrawing money in the form of loans from Ortho-Tain was the avoidance of tax. Petitioners intended *489 to repay those withdrawals only when a tax-free distribution from the corporation became possible, i.e., after they moved to Puerto Rico and became bona fide residents of Puerto Rico. And at that point it became a meaningless exchange of checks written by petitioner. Petitioner drew two checks on Ortho-Tain's account, each in the amount of $ 1,399,750, which petitioners then deposited into their personal account and then wrote a check to Ortho-Tain in the amount of $ 2,799,500. Petitioners make numerous arguments in support of their contention that their withdrawals from Ortho-Tain constituted bona fide loans. First, they assert that they intended, in good faith, to create a debtor/creditor relationship with Ortho-Tain. Second, petitioners state that there was a reasonable expectation of repayment when the loans were made. Third, petitioners demonstrate that the loans bore all of the formal indicia of debt. Fourth, petitioners point out that Ortho-Tain treated the withdrawals as loans on its books and records. Fifth, petitioners state that they made annual interest payments to Ortho-Tain during the years at issue. And finally, petitioners assert that they actually repaid the loans *490 in due course. Although the formal indicia of loans are present in this case, we are not convinced that petitioners' withdrawals from Ortho-Tain constitute bona fide loans for tax purposes. The initial withdrawal as well as all subsequent withdrawals were made under corporate resolutions permitting the loans without any showing of need or other significant restriction. The resolutions were authorized by the board of directors of the corporation, namely petitioners. Therefore, the resolutions have little significance. We think petitioners regarded these loans as a means of withdrawing money from the corporation in a tax-free manner. Additional factors indicating the withdrawals were dividends include: (1) all of the promissory notes executed were payable on demand rather than at a fixed maturity date; (2) none of the loans were either secured by collateral or supported by written repayment schedules; (3) Ortho-Tain apparently had little concern regarding repayment and did not require events of default; (4) none of the loans had a business purpose related to Ortho-Tain's operations, but were instead used for the construction of petitioners' residence or for other personal purposes; *491 (5) no limits seem to have been set on the amount of money petitioners could withdraw from the corporation; and (6) significantly, Ortho-Tain did not issue dividends to petitioners notwithstanding substantial retained earnings until after petitioners considered that they had become Puerto Rican residents. The only credible evidence presented by petitioners which would indicate that these withdrawals were loans are the promissory notes, corporate books and records, and corporate tax returns that characterize these withdrawals as loans. However, while this evidence is to be considered, it is not controlling. "Book entries and records may not be used to conceal a situation which is not in reality what it is made to appear." Fenn v. Commissioner, T.C. Memo. 1980-229. Petitioners point to the payments of interest each year from 1982 through 1987 as indicative of the presence of bona fide loans. However, these interest payments were claimed as deductions on petitioners' personal returns, thus reducing the taxes on their income from the orthodontics practice and their rental properties. Also these purported interest payments were made to their controlled *492 corporation, Ortho-Tain, and became part of the accumulated earnings and profits that petitioners expected to withdraw tax free after they became Puerto Rican residents. Petitioners' use of the interest payments as support for bona fide loans is undercut when one considers the benefits received by petitioners, namely current interest payment deductions and future tax-free distributions from their corporation. Based upon the foregoing considerations, we must reject petitioners' contention that the withdrawals at issue were bona fide loans. We conclude that such amounts should be treated as constructive dividends distributed to petitioners from their corporation. [28] These constructive dividends must be included in petitioners' income, and their deductions for purported interest payments to Ortho-Tain must be disallowed. As to the $ 2,799,500 dividends declared in 1987, we have found that these actual dividends are not excludable from petitioners' gross income under section 933(1). However, respondent, with commendable fairness, has conceded in her reply brief that, if the Court finds the purported loans are constructive dividends, and we have so found, then the actual or declared dividends *493 in 1987 should be disregarded for Federal tax purposes. We agree. Addition to Tax for Late Filing
Respondent has determined additions to tax for late filing under section 6651(a)(1) with respect to petitioners' 1985 and 1986 tax returns. Respondent contends that the 1985 tax return was due (including one automatic extension) on August 15, 1986, but was not received by respondent until October 9, 1986. Respondent contends that the 1986 return was due (including one automatic extension) on August 15, 1987, but was not received by respondent until October 15, 1987. Respondent asserts that petitioners' failure to file in a timely manner was due to willful neglect and not due to reasonable cause within the meaning of section 6651. Section 6651(a)(1) imposes an addition to tax for the failure to *494 file a required return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Sec. 6651(a)(1). To avoid the addition to tax, the taxpayer must prove (1) that the failure to file was due to reasonable cause, and (2) that the failure was not the result of "willful neglect". Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 243 (1985). The burden of proof is upon petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners contend that they did file their 1985 and 1986 returns in a timely manner. They assert that they reasonably relied upon a professional, their certified public accountant, to execute and timely file Forms 4868, requesting automatic 4-month extensions, and Forms 2688, requesting second 2-month extensions. Petitioners contend that respondent did not notify them of her approval or rejection of the second extension requests. Petitioners proceeded to file the returns on what they considered to be the extended due dates. For purposes of section 6651(a)(1) "reasonable cause" has been defined as the exercise of "ordinary business care and prudence." *495 Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. In United States v. Boyle, supra, the Supreme Court clarified the meaning of reasonable cause in the situation where the executor of an estate relied upon his attorney to timely file the Federal estate tax return. In Boyle, the executor argued that because he relied upon counsel to timely file a return for the estate, his failure to timely file was due to reasonable cause. The Supreme Court held that reliance on an agent does not excuse the failure to make a timely filing of a tax return and stated: Congress has placed the burden of prompt filing on the executor, not on some agent or employee of the executor. * * * That the attorney, as the executor's agent, was expected to attend to the matter does not relieve the principal of his duty to comply with the statute.
United States v. Boyle, 469 U.S. at 249-250; see Estate of Paxton v. Commissioner, 86 T.C. 785, 819 (1986); Jackson v. Commissioner, 86 T.C. 492, 538 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Douglas v. Commissioner, T.C. Memo. 1989-592. *496 It should also be noted that the general instructions accompanying Form 2688 specifically advise taxpayers that a request for an additional extension of time to file a tax return must show reasonable cause for the additional delay in filing a return and should be filed early so that "if denied, you can still file your return on time". See Galuska v. Commissioner, 98 T.C. 661 (1992), affd. 5 F.3d 195 (7th Cir. 1993). In this case, the evidence clearly shows that petitioners relied upon their accountant to properly prepare and timely file their extension requests and their tax returns. However, in light of Boyle, reliance upon an agent to timely file such documents with the Internal Revenue Service does not constitute "reasonable cause". Furthermore, petitioners have not made a sufficient showing that they or their accountant exercised ordinary business care and prudence in the filing of those extension requests or that there was a loss of the extension requests by the Internal Revenue Service. The Internal Revenue Service does not have any record of any second extension requests (Forms 2688) being filed by petitioners *497 or on petitioners' behalf for the taxable years 1985 and 1986. Therefore, petitioners are liable for the additions to tax under section 6651(a)(1) as determined by respondent. Addition to Tax for Negligence
Respondent has determined additions to tax under section 6653(a) for negligence with respect to all of the adjustments at issue in this case. Petitioners contend that the positions that they took on their tax returns for the years at issue were reasonable. Negligence additions will not be applied where the deficiency is due to a mistaken interpretation of the law on which there can be an honest difference of opinion. Foster v. Commissioner, 756 F.2d 1430, 1439 (9th Cir. 1985), affg. in part and vacating in part 80 T.C. 34 (1983); Wiggins v. Commissioner, 92 T.C. 869, 873-874 (1989), affd. 904 F.2d 311 (5th Cir. 1990). Petitioners also contend that each adjustment at issue involves "a relatively complex legal issue on which there can be an honest difference of opinion." Yelencsics v. Commissioner, 74 T.C. 1513, 1533 (1980); Scott v. Commissioner, 61 T.C. 654, 663 (1974). *498 We agree with petitioners and conclude that the negligence additions are inappropriate in this case. Addition to Tax for Substantial Understatement
For the taxable years at issue, respondent has determined additions to tax for substantial understatements under section 6661 with respect to all of the adjustments at issue, except as specifically conceded on brief. See supra note 1. In addition, in the notice of deficiency, respondent asserted that the interest expense deductions claimed by petitioners on the 1985 and 1986 tax returns constitute "tax shelter items" as defined in section 6661(b)(2)(C). [29]
*499 Section 6661 imposes an addition to tax for a substantial understatement of income tax. Sec. 6661(a). A substantial understatement is defined as an understatement exceeding the greater of $ 5,000 or 10 percent of the tax required to be shown on the return for the taxable year. Sec. 6661(b)(1)(A). The understatements of tax for the taxable years at issue are substantial in this case. Section 6661(b)(2)(B) reduces the amount of the understatement potentially subject to the addition if the taxpayer gave substantial authority for his or her position or adequately disclosed on the return or in a statement attached to the return the relevant facts affecting the items that led to the determination of the understatement. Section 1.6661-3, Income Tax Regs., defines "substantial authority". In the case of a tax shelter item, the amount of the understatement is reduced only if the taxpayer reasonably believed that the tax treatment was more likely than not the proper treatment, regardless of whether the taxpayer adequately disclosed the item. Sec. 6661(b)(2)(C)(i). Petitioners contend that they had substantial authority for the positions taken on their tax returns for the taxable years at *500 issue. Sec. 1.6661-3(a)(2), Income Tax Regs. In addition, petitioners assert that their payments of interest to Ortho-Tain did not constitute tax shelter items within the meaning of section 1.6662-4(g), Income Tax Regs., because the principal purpose of paying interest to Ortho-Tain was not tax avoidance or evasion. They emphasize that Ortho-Tain reported and paid in full the U.S. Federal income tax due on that interest income. Petitioners furthermore emphasize that they adequately disclosed the interest expense payments on their tax returns. We agree with petitioners that they have satisfied the requirements of section 6661 and are not liable for the additions to tax under section 6661 as determined by respondent. Furthermore, although we hold that the loans in this case constitute constructive dividends and that petitioners are not entitled to deductions for interest expense, we do not think that such interest expense deductions, in the total complex factual situation of this case, rise to the level of "tax shelter items" as contemplated by section 6661(b)(2)(C). Cf. Foster v. Commissioner, 756 F.2d at 1439. Conclusion
Petitioners were not *501 bona fide residents of Puerto Rico during the entire taxable year in either 1986 or 1987. Therefore, they are not entitled to exclude from gross income any Puerto Rican source income under the provisions of section 933(1). For each of the taxable years before the Court, we hold that the withdrawals from Ortho-Tain constitute constructive dividends rather than loans from Ortho-Tain. We further hold that petitioners are not entitled to the interest payment deductions for those years. However, the declared dividends in 1987 are to be disregarded for Federal tax purposes. Petitioners may defer gain recognition on the sale of their Winnetka house under the provisions of section 1034. Petitioners are liable for additions to tax under section 6651(a)(1) for the late filing of their 1985 and 1986 tax returns. Petitioners are not liable for additions to tax for negligence or for substantial understatements of income tax in any year before the Court. Based upon the foregoing, Decision will be entered under Rule 155. Footnotes
1. For 1986 and 1987, sec. 6653(a)(1)(A) applies.↩
2. For 1986 and 1987, sec. 6653(a)(1)(B) applies.↩
1. Petitioners conceded the disallowance of advertising expenses in the amount of $ 16,031 and travel expenses in the amount of $ 11,317 for the taxable year 1985. In an amendment to the answer, respondent raised two new issues and asserted increases in the deficiencies and additions to tax for the years at issue. The first issue was whether Ortho-Tain, Inc. (Ortho-Tain), properly elected the cost-sharing method of calculating its income. Respondent conceded this issue prior to trial. The second issue involved a determination of the extent to which Ortho-Tain's intangible property constituted marketing intangibles within the meaning of sec. 936(h)(5)(C)(i)(II). Respondent conceded this second issue on brief. Respondent also conceded that sec. 6661 shall not apply to the gain from the sale of petitioners' principal residence, if such gain is determined herein to be taxable, or to the above deductions for advertising expense and travel expense.↩
2. In their petition, petitioners claimed an interest payment deduction of $ 52,459 for the taxable year 1987, which had not been claimed on their 1987 return.↩
3. The parties have stipulated that, if the Court finds that petitioners' 1986 Federal income tax return was not timely filed and that the late filing addition to tax under sec. 6651(a)(1) applies, the addition to tax applies at a rate of 10 percent and not 15 percent as determined by respondent in the notice of deficiency.↩
4. Petitioners now argue that they were also bona fide residents of Puerto Rico for the entire taxable year 1986. They suggest that they filed a U.S. tax return for that year and did not file a Puerto Rican tax return because they mistakenly believed that they had to have been physically present in Puerto Rico on December 31, 1985, and January 1, 1986, to be eligible for residency. In view of petitioners' long-ranged and sophisticated tax planning based upon the benefits of Puerto Rican residency under sec. 933(1) and the accumulation of earnings and profits in their closely held Puerto Rican possessions corporation under sec. 936 until they thought they could distribute tax-free dividends of $ 2,799,500 in 1987 and $ 2,143,279 in 1988, the Court does not find petitioners' professed naivete on the matter of residency to be persuasive.↩
5. Petitioner reported wages of $ 110,000 from Ortho-Tain Enterprises, Inc. (OTE), as gross income for the 1975 taxable year. At trial, petitioner testified that OTE was audited by the Internal Revenue Service (IRS) for the taxable year 1975, and that the IRS determined that his salary was excessive. The record does not indicate what portion of that salary was disallowed as a deduction to OTE. The payment would have been taxable to petitioner whether it was wages or dividends, unless OTE had insufficient earnings and profits, in which event it would have been return of capital to petitioner. To the extent that petitioner suggests this early audit was the reason he took no salary from Ortho-Tain, Inc., in later years, the Court finds that unpersuasive.↩
6. During this same time period, petitioner's actual practice of orthodontics was decreasing. However, to maintain credibility with his audiences, petitioner carefully cultivated the image of being an active practitioner of orthodontics.↩
7. Petitioner organized Dental Lectures Corporation (DLC), a Puerto Rican corporation, in 1984. During the years at issue, DLC directly, or in conjunction with the United States Dental Institute (USDI), sponsored all of petitioner's seminars. Petitioner testified that he organized DLC to protect himself against personal liability or malpractice claims and to collect the income he received for the seminars. Petitioner also transferred the corpus of his profit-sharing plan and trust from his orthodontics practice to DLC. Petitioner explained that DLC was incorporated in Puerto Rico, and the plan and trust were transferred to DLC because he intended to become a Puerto Rican resident, and it was logical for DLC and the profit-sharing plan and trust to be located there as well. The corpus of the profit-sharing trust approximated $ 1 million or more during the years involved in this case.↩
8. At the end of 1988 or the beginning of 1989, Ortho-Tain became a Puerto Rican corporation due to the various statutory changes to sec. 936 that petitioners felt made it less desirable for the corporation to continue as a possessions corporation.↩
9. Petitioner originally had planned to conduct his dental seminars in his Puerto Rican home rather than travel around the United States. However, after further researching the costs and booking of hotel rooms for seminar participants, he decided that conducting the seminars in Puerto Rico would not be feasible.↩
10. Mrs. Bergersen testified that she has had only three gatherings there over the years, one an open house because her friends were curious to see the townhouse, and she had never invited them over before.↩
11. Around November of 1985, Mr. Sedwick had recently gotten married and was planning to vacate his apartment. Petitioner sublet the apartment from Mr. Sedwick. Although petitioners argue that they moved into that apartment and therefore became residents of Puerto Rico in November of 1985, the Court is satisfied that their ties to Illinois and the Glenview townhouse were far stronger than any ties to Puerto Rico at that time. The Court also was not persuaded by their arguments that they moved to Puerto Rico at that time to supervise the construction of the Dorado Beach house. Any supervision or oversight of construction by petitioners was sporadic and minimal in view of their heavy travel schedule for the seminars and their other professional and family activities in the Illinois area. The Court rejects petitioners' self-serving testimony as to their intentions and actions in November of 1985 and finds it unworthy of belief.↩
12. Pickens Kane moves household and commercial goods in Chicago and the suburban areas of Chicago. The company itself does not move goods overseas but does package goods for shipment through Allied Van Lines to Puerto Rico. Petitioners' bill of lading with Pickens Kane for goods shipped in October of 1986 called for the company to "wrap and load for overseas".↩
13. In January of 1986, Mrs. Bergersen read in U.S. News and World Report magazine about the plight of Iowa farmers who had been bankrupted during the farm crises of the 1980's. Petitioners planned to hire household staff for the Dorado Beach house to cook, clean, and maintain the grounds and thought a farm family might perform well in these positions and want such positions as a fresh start. Petitioners contacted the priest featured in the article, interviewed 10 farm couples, and hired William and Coryl Eberle as their gardener and housekeeper.↩
14. Although petitioners testified they "moved into" the Dorado Beach house in August of 1986, the Court rejects their self-serving generalized testimony and rejects their characterization of the events.↩
15. William Eberle worked as petitioners' gardener until his death in 1990, and Coryl Eberle still lives at the Dorado Beach house and works as petitioners' housekeeper. In 1986 and 1987 Ortho-Tain paid the salaries of the Eberles.↩
16. Petitioners' payment to Pickens Kane in October of 1985 was in the amount of $ 2,834, and their payment in October of 1986 was in the amount of $ 2,348.↩
17. Petitioner explained that he obtained replacement Illinois driver's licenses because his Puerto Rican attorney advised him that a Puerto Rican driver's license might make it difficult to rent automobiles in the United States in connection with petitioners' seminar travels.↩
1. Ortho-Tain did not pay any dividends to petitioners' children, the shareholders of stock classes B and C, during the years 1977 through 1988.↩
18. Our use of the terms "loan", "repayment", "note", and other similar terms is for ease of analysis while setting forth the facts of this case. We will discuss in the opinion below whether petitioner's withdrawals from Ortho-Tain actually constitute bona fide loans for tax purposes.↩
19. Since Ortho-Tain commenced operations, petitioner has written and signed all of Ortho-Tain's disbursement checks. Mr. Ortiz provided petitioner with information regarding Ortho-Tain's payables for this purpose. Ortho-Tain did not have a full-time comptroller or accountant.↩
20. It was office procedure to attach such copies of extension requests to a tax return prior to filing the return.↩
21. Mrs. Bergersen's many references to Illinois as "home" on her calendar during the beginning of 1986 cannot be overlooked. Such evidence reflects that petitioners themselves were not quite ready to wholly abandon Illinois in favor of permanent residency in Puerto Rico at that time.↩
22. The Puerto Rican labor and materials costs for which the construction supervisor, Mr. Tony Martin, wrote the checks amply demonstrate that fact.↩
23. The parties have stipulated that, if the Glenview townhouse is found to have been petitioners' new principal residence, petitioners' 1985 taxable income shall be increased by $ 126,180. The parties have stipulated, in the alternative, that, if the Dorado Beach house is found to have been petitioners' new principal residence, the entire gain on the sale of the Winnetka house will not be recognized during the years at issue under section 1034. To the extent that these stipulations may be inconsistent with sec. 1034(c)(4), the Court will disregard them as improper stipulations of law.↩
24. One can own several residences no one of which constitutes a principal residence. Also, the absence of a principal residence does not mean one is no longer a U.S. resident.↩
25. The parties agree that Ortho-Tain had sufficient earnings and profits for this purpose.↩
26. See Crowley v. Commissioner, T.C. Memo. 1990-636, affd. 962 F.2d 1077↩ (1st Cir. 1992).
27. In Pullman-Standard v. Swint, 456 U.S. 273 (1982), the Supreme Court held that the issue of discriminatory intent in a Title VII case is a question of fact. The Supreme Court ruled that where "intent" means "actual motive," it is a question of fact; where intent is a legal presumption to be drawn from a factual showing of something less than actual motive, the issue may be a mixed question of law and fact. Id. at 289-290. For example, in tort law, intent is a legal presumption, where a person is presumed to have intended the natural consequences of his actions. See Busch v. Commissioner, 728 F.2d 945, 949↩ n.4 (7th Cir. 1984).
28. Since we have held that all of the distributions made to petitioners during the taxable years at issue constitute constructive dividends, we need not address respondent's alternative argument concerning compensation.↩
29. On brief, respondent appears to be arguing that all of the adjustments in the notice of deficiency pertain to a plan the principal purpose of which was to avoid tax and, therefore, constitute tax shelter items. This Court will not consider issues that are raised for the first time at trial or on brief. Rules 34(b)(2), 41(b); Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997↩ (1975).